United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 7, 2000 Decided September 21, 2001 

 No. 00-5016

 The Honorable John H. McBryde, 
 United States District Judge for the 
 Northern District of Texas, 
 Appellant

 v.

 Committee to Review Circuit Council Conduct and 
 Disability Orders of the Judicial Conference 
 of the United States, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia
 (No. 98cv02457)

 David Broiles and Arnon D. Siegel argued the cause and 
filed the briefs for appellant.

 William B. Schultz, Deputy Assistant Attorney General, 
U.S. Department of Justice, argued the cause for appellee 

United States of America. David W. Ogden, Assistant Attor-
ney General, Mark B. Stern and Scott R. McIntosh, Attor-
neys, and Wilma A. Lewis, U.S. Attorney at the time the 
brief was filed, were on the brief. Thomas W. Millet, Attor-
ney, U.S. Department of Justice, entered an appearance.

 Robert B. Fiske, Jr. argued the cause for appellees the 
Committee to Review Circuit Council Conduct and Disability 
Orders of the Judicial Conference of the United States, et al. 
With him on the brief was Lowell Gordon Harriss.

 Before: Williams and Tatel, Circuit Judges, and 
Silberman, Senior Circuit Judge.

 Opinion for the Court filed by Circuit Judge Williams.

 Separate opinion filed by Circuit Judge Tatel, concurring 
in part and dissenting in part.

 Williams, Circuit Judge: On December 31, 1997 the Judi-
cial Council of the Fifth Circuit (the "Judicial Council" or 
"Council"), acting under the Judicial Conduct and Disability 
Act of 1980, 28 U.S.C. s 372(c) (the "Act"), imposed sanctions 
on the Honorable John H. McBryde, United States District 
Judge for the Northern District of Texas. The sanctions 
followed a two-year investigation by a Special Committee of 
the Judicial Council ("Special Committee"), including nine 
days of hearings. The Committee took evidence relating to 
incidents spanning the entirety of Judge McBryde's judicial 
career and involving encounters with judges and lawyers both 
inside and outside his courtroom. (We will consider an 
example from the exhaustive record when we address Judge 
McBryde's argument that the Council illegally considered the 
merits of his judicial decisions.)

 The investigation culminated in a 159-page report in which 
the Special Committee concluded that "Judge McBryde ha[d] 
engaged for a number of years in a pattern of abusive 
behavior" that was " 'prejudicial to the effective and expedi-
tious administration of the business of the courts.' " Report 
of the Special Committee of the Fifth Circuit Judicial Coun-
cil Regarding Complaints Against, and the Investigation 

into the Conduct of, Judge John H. McBryde at 150-51 (Dec. 
4, 1997) ("Committee Report") (quoting 28 U.S.C. s 372(c)). 
The Report also recommended a variety of sanctions based on 
the provisions of s 372(c)(6)(B): that Judge McBryde receive 
a public reprimand, pursuant to subsection (v); that no new 
cases be assigned to him for a year, pursuant to subsection 
(iv); and that he not be allowed for three years to preside 
over cases involving any of 23 lawyers who had participated in 
the investigation, pursuant to subsection (vii) (providing for 
"other action" considered appropriate in light of circum-
stances). See Committee Report at 152-58. The Judicial 
Council endorsed the recommendations and issued an order 
imposing the recommended sanctions. See In re: Matters 
Involving United States District Judge John H. McBryde, 
Under the Judicial Conduct and Disability Act of 1980, No. 
95-05-372-0023 (Jud. Council 5th Cir. Dec. 31, 1997) ("Judi-
cial Council Order"). The lawyer-related disqualification be-
came effective on February 6, 1998, but the Council stayed 
the reprimand and the one-year suspension pending review 
by the Committee to Review Circuit Council Conduct and 
Disability Orders of the Judicial Conference of the United 
States (the "Review Committee"). On September 18, 1998 
the Review Committee substantially affirmed the Council's 
action and lifted the stay. See In re: Complaints of Judicial 
Misconduct or Disability, No. 98-372-001 (Jud. Conf. U.S. 
Sept. 18, 1998) ("Judicial Conference Report").

 Soon thereafter Judge McBryde brought suit in district 
court, claiming that the Act, both facially and as applied, 
violated the due process clause and the Constitution's separa-
tion of powers doctrine.1 He also claimed that the initiation 
and conduct of the investigation against him exceeded the 
authority granted by the statute. Finally, he posed a First 
Amendment challenge to the Act's restrictions on disclosing 

__________
 1 Defendants/Appellees in this case are the Review Committee; 
Judge William J. Bauer, individually and as Chairman and as 
member of the Review Committee; the Judicial Council; and Judge 
Henry J. Politz, individually and as Chief Judge of the Court of 
Appeals for the Fifth Circuit and as presiding member of the 
Judicial Council, at the relevant times.

the record of the proceedings. On cross motions for sum-
mary judgment, the district court agreed with Judge 
McBryde's First Amendment argument, McBryde v. Commit-
tee to Review Circuit Council Conduct and Disability Orders, 
83 F. Supp. 2d 135, 171-78 (D.D.C. 1999), but rejected the 
rest. Only Judge McBryde appealed; here he repeats the 
essence of his remaining arguments.

 Judge McBryde's claims are moot insofar as they distinc-
tively relate to the one-year suspension, which expired on 
September 18, 1999, and the three-year disqualification, which 
expired on February 6, 2001. Certain of the non-moot claims 
are barred by the Act's preclusion of judicial review, 28 
U.S.C. s 372(c)(10), namely the "as applied" and statutory 
challenges; the district court was therefore without jurisdic-
tion to hear them. We vacate the district court's judgment 
insofar as it addressed the moot or precluded issues. Judge 
McBryde's remaining constitutional challenges fail on their 
merits; we therefore affirm the district court's ruling. We 
address first mootness, then preclusion, and finally the mer-
its.

 * * *

 Article III, Section 2 of the Constitution permits federal 
courts to adjudicate only "actual, ongoing controversies." 
Honig v. Doe, 484 U.S. 305, 317 (1988). If events outrun the 
controversy such that the court can grant no meaningful 
relief, the case must be dismissed as moot. See, e.g., Church 
of Scientology of California v. United States, 506 U.S. 9, 12 
(1992). This requirement applies independently to each form 
of relief sought, see Friends of the Earth v. Laidlaw, 528 U.S. 
167, 185 (2000), and "subsists through all stages of federal 
judicial proceedings, trial and appellate," Lewis v. Continen-
tal Bank Corp., 494 U.S. 472, 477 (1990).

 The one-year and three-year bans have expired. No relief 
sought in this case would return to Judge McBryde the cases 
he was not assigned or otherwise improve his current situa-
tion. These claims will therefore be moot unless they are 
"capable of repetition, yet evading review." Weinstein v. 
Bradford, 423 U.S. 147, 149 (1975). Both the Supreme Court 

and this court have held that "orders of less than two years' 
duration ordinarily evade review." Burlington Northern 
R.R. Co. v. Surface Transp. Bd., 75 F.3d 685, 690 (D.C. Cir. 
1996); see also Southern Pac. Terminal Co. v. ICC, 219 U.S. 
498, 514-16 (1911). So the one-year exclusion safely qualifies. 
We will assume in Judge McBryde's favor the same for the 
three-year exclusion.

 But are the injuries "capable of repetition"? Stated more 
formally, this requires "a reasonable expectation that the 
same complaining party would be subjected to the same 
action again." Weinstein, 423 U.S. at 149. When considering 
the likelihood that an injury will be repeated, the Supreme 
Court has in general "been unwilling to assume that the party 
seeking relief will repeat the type of misconduct that would 
once again place him or her at risk of that injury." Honig, 
484 U.S. at 320 (citing City of Los Angeles v. Lyons, 461 U.S. 
95, 105-06 (1983); Murphy v. Hunt, 455 U.S. 478, 484 (1982); 
O'Shea v. Littleton, 414 U.S. 488, 497 (1974)). Honig created 
an exception to this general principle on the ground that 
there it was the disabled respondent's "very inability to 
conform his conduct to socially acceptable norms that ren-
der[ed] him 'handicapped.' " 484 U.S. at 320. We have no 
basis for concluding that there is any parallel inability here.

 In the cases cited by Honig the parties did not challenge 
the underlying laws that proscribed their potential future 
conduct. See, e.g., O'Shea, 414 U.S. at 496-97. McBryde 
obviously does challenge the Act and the authority of the 
defendants to enforce norms of judicial conduct. But he does 
not appear to challenge the norms themselves. To be sure, 
he asserts that the Special Committee's report is vague and 
provides inadequate notice of what actions are prohibited. 
But the fundamental standard sought to be enforced by the 
defendants can plainly be discerned--that a judge should 
demonstrate at least a modicum of civility and respect to-
wards the professionals with whom he or she works. The 
standard is also familiar, as it clearly echoes Canon 3(A)(3) of 
the Code of Judicial Conduct for Federal Judges. See Code 
of Judicial Conduct for United States Judges, Canon 3(A)(3); 

Judicial Council Order at 2. Judge McBryde does not, so far 
as we can determine, ever challenge this basic notion any-
more than the plaintiff in Lyons claimed a right to engage in 
the sort of conduct that (he said) commonly led to police use 
of chokeholds. Indeed at oral argument counsel for Judge 
McBryde specifically acknowledged that at least some of the 
conduct "could be considered inappropriate." See Oral Arg. 
Tr. at 80-81. With this decision's confirmation of the Judicial 
Council's authority to sanction Judge McBryde for consistent 
failure to adhere to this norm, we think the risk of recurrence 
fairly slight. We recognize that docket limitations can be a 
very serious matter. See Wozniak v. Conry, 236 F.3d 888, 
890 (7th Cir. 2001) (holding that depriving a tenured profes-
sor of all teaching and research responsibilities affected a 
property interest sufficiently to entitle him to some kind of a 
hearing). But here the two restrictions on Judge McBryde's 
docket have become moot.

 The dispute over the public reprimand, however, remains 
alive. Any thought that the reprimand is a past and irrevers-
ible harm is belied by the fact that it continues to be posted 
on the web site of the Fifth Circuit Court of Appeals,2 with a 
link on the home page alongside items for current use such as 
the court's calendar and opinions.3 Even absent that use of 
modern technology it would be a part of the historical record. 
Were Judge McBryde to prevail on the merits it would be 
within our power to declare unlawful the defendants' issuance 
of stigmatizing reports and thereby to relieve Judge McBryde 
of much of the resulting injury.

 No one has suggested that this injury to reputation is not 
enough to afford Judge McBryde standing (the three-year 
limit was in effect at the time of oral argument). But we 
have a duty to be sure of our own jurisdiction, see Bender v. 
Williamsport Area School Dist., 475 U.S. 534, 541 (1986), so 
we consider the question. The Court has, of course, ruled 
that mere injury to reputation is not enough of an impinge-
ment on a person's liberty or property interest to trigger a 

__________
 2 See <http://www.ca5.uscourts.gov/mcbryde.htm>, last ac-
cessed on June 20, 2001.

 3 See <http://www.ca5.uscourts.gov/>, last accessed on June 
20, 2001.

requirement of due process. See Paul v. Davis, 424 U.S. 693 
(1976). But injury to reputation can nonetheless suffice for 
purposes of constitutional standing. Thus, in Meese v. Keene, 
481 U.S. 465 (1987), the Court found that a politician and film 
distributor had standing to challenge a government agency's 
stigmatizing as "political propaganda" foreign films that he 
wished to exhibit. The Court rested not only on affidavits 
indicating that this branding would affect his chances for 
reelection, id. at 473-74, but also on the impact on his 
reputation generally, id. Here, the official characterization of 
an apparently upstanding federal judge as having "engaged 
for a number of years in a pattern of abusive behavior" that 
was " 'prejudicial to the effective and expeditious administra-
tion of the business of the courts' " inflicts, we think, enough 
injury. Committee Report at 150-51 (quoting 28 U.S.C. 
s 372(c)).

 At some point, however, claims of reputational injury can 
be too vague and unsubstantiated to preserve a case from 
mootness. See Advanced Management Technology, Inc. v. 
FAA, 211 F.3d 633, 636-37 (D.C. Cir. 2000). Insofar as the 
one-year and three-year suspensions may have continuing 
reputational effects on top of the defendants' express repri-
mand, they are not enough. The legally relevant injury is 
only the incremental effect of a record of the suspensions 
(since the fact of the suspensions can no longer be remedied), 
over and above that caused by the Council's and the Confer-
ence's explicit condemnations. See Friedman v. Shalala, 46 
F.3d 116, 117-18 (1st Cir. 1995). And even as to that 
increment the most we could say at McBryde's behest is that 
in imposing and affirming the suspension sanction the Judicial 
Council and Review Committee performed acts reserved by 
the Constitution to the House and a two-thirds majority of 
the Senate. We cannot see how this would rehabilitate his 
reputation. Moreover, the Supreme Court has strongly sug-
gested, without deciding, that where an effect on reputation is 
a collateral consequence of a challenged sanction, it is insuffi-
cient to support standing or, presumably, to escape mootness. 
See Spencer v. Kemna, 523 U.S. 1, 16-17 n.8 (1998). In this 
circuit, when injury to reputation is alleged as a secondary 

effect of an otherwise moot action, we have required that 
"some tangible, concrete effect" remain, susceptible to judicial 
correction. See Penthouse Int'l, Ltd. v. Meese, 939 F.2d 
1011, 1019 (D.C. Cir. 1991).

 * * *

 Although the injury to Judge McBryde's reputation pre-
serves the public reprimand from mootness and affords 
standing, yet another question remains about our jurisdiction. 
The statute enabling the Judicial Council and Review Com-
mittee to consider Judge McBryde's conduct sets out the 
avenues through which a judge may challenge actions taken 
against him. 28 U.S.C. s 372(c)(10). It allows a petition to 
the Judicial Conference for review of a decision of the judicial 
council taken under s 372(c)(6). It then appears to preclude 
alternative avenues of review:

 Except as expressly provided in this paragraph, all or-
 ders and determinations, including denials of petitions for 
 review, shall be final and conclusive and shall not be 
 judicially reviewable on appeal or otherwise.
 
28 U.S.C. s 372(c)(10). Twice in the past this provision has 
appeared before us, but on neither occasion did we need to 
resolve its meaning. See Hastings v. Judicial Conference of 
the United States, 829 F.2d 91, 107 (D.C. Cir. 1987) ("Has-
tings II"); Hastings v. Judicial Conference of the United 
States, 770 F.2d 1093, 1103 (D.C. Cir. 1985) ("Hastings I").

 There are some claims that this section definitely does not 
preclude. The statutory language closely parallels that con-
strued in Johnson v. Robison, 415 U.S. 361 (1974), where 
Congress provided that "decisions" of the Veterans Adminis-
tration "on any question of law or fact" under certain laws 
"shall be final and conclusive," and expressly withheld juris-
diction from any court to review "any such decision." Id. at 
365 n.5 (quoting the then-applicable version of 38 U.S.C. 
s 211(a)). The Court held that s 211(a) had no application to 
challenges to the constitutionality of the statutes in question, 

i.e., challenges to the decisions of Congress, not the Veterans 
Administration. See id. at 367. This interpretation allowed 
the Court to avoid the " 'serious constitutional question' " that 
would be posed "if a federal statute were construed to deny 
any judicial forum for a colorable constitutional claim." Web-
ster v. Doe, 486 U.S. 592, 603 (1988) (quoting Bowen v. 
Michigan Academy of Family Physicians, 476 U.S. 667, 681 
n.12 (1986)). Similarly, the wording of s 372(c)(10) does not 
withhold jurisdiction over Judge McBryde's claims that the 
Act unconstitutionally impairs judicial independence and vio-
lates separation of powers.

 This leaves four claims in addition to the facial constitution-
al challenges. Two of these four also invoke the Constitution, 
challenging the actions of the defendants in applying the Act 
to Judge McBryde. The first claim is that the defendants 
inflicted their sanction without providing him due process. 
This claim principally involves an assertion that the whole 
project arose out of a conflict between himself and then-Chief 
Judge Politz, whose actions furthering the investigation 
Judge McBryde regards as "retaliation" and who, he claims, 
combined "investigative, charging, prosecutorial and adjudica-
tive functions." Judge McBryde argues, in effect, that he 
was denied due process because Judge Politz refused to 
recuse himself. The second constitutional claim is somewhat 
obscure. He argues, in essence, that the methods used by 
the Judicial Council and Judicial Conference in imposing the 
sanction, were particularly invasive and therefore violated 
judicial independence. He cites two examples. When the 
Review Committee amended the Judicial Council's order so as 
to permit reinstatement if the council found that Judge 
McBryde had "seized the opportunity for self-appraisal and 
deep reflection in good faith," Judicial Conference Report at 
24, it engaged (he says) in forbidden "judicial behavior modifi-
cation." And the Judicial Council's use of psychiatrists for 
advice on Judge McBryde's mental health, and on the possi-
ble causes of his conduct, was "fundamentally destructive of 
judicial independence."

 Beyond these constitutional claims are two phrased by 
Judge McBryde as assertions that the actions of the Special 

Committee, the Council and the Review Committee against 
him were "Beyond the Agencies' Statutory Jurisdiction." 
One of these claims is in fact an attack on the defendants' 
procedures, namely an argument that although the investiga-
tive process was launched by complaints formally filed under 
s 372, it widened as it went on to encompass conduct not 
mentioned in those initial complaints. The other is a claim 
that the defendants were without statutory authority to inves-
tigate and penalize Judge McBryde "for" the merits of his 
decisions and rulings (his characterization of defendants' ac-
tions). We conclude that s 372(c)(10) bars all four chal-
lenges.

 As we said, two of the claims are framed in constitutional 
terms. When the Constitution is invoked, a claim of preclu-
sion faces an especially high hurdle. "[W]here Congress 
intends to preclude judicial review of constitutional claims its 
intent to do so must be clear." Webster, 486 U.S. at 603 
(citing Robison, 415 U.S. at 373-74). And a series of cases in 
this circuit have held that this special clarity is necessary 
even for as applied challenges. See Griffith v. FLRA, 842 
F.2d 487, 494-95 (D.C. Cir. 1988); Ungar v. Smith, 667 F.2d 
188, 193 (D.C. Cir. 1981); Ralpho v. Bell, 569 F.2d 607, 620-
21 (D.C. Cir. 1977). Under these cases, we find preclusion of 
review for both as applied and facial constitutional challenges 
only if the evidence of congressional intent to preclude is 
"clear and convincing." The preclusive language here is quite 
similar to that of 5 U.S.C. s 8128(b), which the Court singled 
out in Lindahl v. OPM, 470 U.S 768, 779-80 & n.13 (1985), as 
an "unambiguous and comprehensive" preclusion of review. 
See also Czerkies v. Department of Labor, 73 F.3d 1435, 1443 
(7th Cir. 1996) (Easterbrook, J., concurring). But see id. 73 
F.3d at 1442 (majority opinion finding jurisdiction despite 
s 8128(b)); Paluca v. Secretary of Labor, 813 F.2d 524, 525 
(1st Cir. 1987) (same). But under this court's Ralpho trilogy, 
we have not regarded broad and seemingly comprehensive 
statutory language as supplying the necessary clarity to bar 
as applied constitutional claims. See Griffith, 842 F.2d at 490 
(citing 5 U.S.C s 7123(a) (1982)); Ungar, 667 F.2d at 193 
(citing 22 U.S.C. s 1631o(c) (1976)); Ralpho, 569 F.2d at 613 

(citing s 2020 of the Micronesian Claims Act of 1971). In the 
absence of explicit statutory language barring review of con-
stitutional challenges, the opinions studied the legislative 
history, finding the clear and convincing standard unsatisfied 
in all three cases. Griffith, 842 F.2d at 494-95; Ungar, 667 
F.2d at 196; Ralpho, 569 F.2d at 621-22.

 We pretermit the possibility that the Supreme Court's 
decision in Traynor v. Turnage, 485 U.S. 535, 542-45 (1988), 
postdating the last of the circuit trilogy (Griffith), has under-
mined the trilogy's premise. It may have done so by treating 
the Robison decision (source of the circuit trilogy) as deriving 
more from statutory language allowing review of attacks on 
the facial validity of the provision being applied (whether the 
attack was statutory or constitutional), and less from ideas of 
special status for constitutional claims.

 Assuming arguendo the full applicability of the circuit 
trilogy, however, we nonetheless find the requisite clarity of 
preclusive intent. Of course if the trilogy is read to require 
magic words expressly barring as applied constitutional at-
tacks, they are not to be found. But the legislative history 
manifests express concern over the Robison issue and what 
appears to have been a deliberate congressional effort to 
assure that in practice ample review would occur. Congress 
vested the authority for implementing the Act exclusively in 
the hands of Article III judges, providing for initial action by 
one group of such judges and for review by another group. 
Having done so, Congress clearly meant to be understood 
quite literally when it said in s 372(c)(10) that orders of the 
Judicial Conference or relevant standing committee "shall not 
be judicially reviewable on appeal."

 The Senate bill would have established a special Article III 
court for review of misconduct findings--coupled with preclu-
sion of any other review. S. 1873, as reported out of commit-
tee and as passed by the Senate, provided for creation of a 
" 'court of record to be known as the Court on Judicial 
Conduct and Disability.' " See S. 1873, 96th Cong. s 2(a) 
(proposed 28 U.S.C. s 372(g)(1)) (as reported to the full 
Senate by the Judiciary Committee on October 10, 1979). 

" 'The Court may exercise all appropriate judicial powers 
incident or necessary to the jurisdiction conferred upon it.' " 
Id. The bill precluded further review of the Court's actions 
in language similar to that of the final version: " 'There shall 
be no judicial review of any order or action of the Court taken 
under this subsection or subsection (h).' " Id. (proposed 28 
U.S.C s 278(i)(3)). In discussing the new Court, the Commit-
tee report said:

 A national court of stature will help to alleviate the fear 
 and public perception of a local "whitewash" of a citizen's 
 complaint. It will also provide a forum for a judge who 
 believes that the council of his circuit has acted against 
 him in an unwarranted or unfair manner. In addition, by 
 providing this court with broad discretionary power to 
 regulate the number of cases it wishes to hear, the 
 provision assures that a bureaucratic, excessively formal-
 ized procedure will be avoided.
 
S. Rep. No. 96-362, at 3 (1980), reprinted in 1980 U.S.C.A.A.N. 
4315, 4317.

 In the Senate debate, Senator DeConcini introduced a 
report commissioned by the Judiciary Committee's staff and 
prepared by Mr. Johnny H. Killian. The report directly 
addressed the Robison issue. After reviewing Supreme 
Court authority on whether any right of appeal was required, 
the report said:

 The Supreme Court in dicta in recent cases has hinted 
 that preclusion of judicial review of constitutional claims 
 might raise constitutional questions, Johnson v. Robison, 
 41[5] U.S. 361, 366-67 (1974); Weinberger v. Salfi, 422 
 U.S. 749, 761-762 (1975), but its concern appears to be 
 that litigants at some point have access to an Article III 
 court, Territory of Guam v. Olsen, 431 U.S. 195, 201-202, 
 204 (1977), and the Court on Judicial Conduct and Dis-
 ability would be an Article III court.
 
125 Cong. Rec. 30,050/1 (Oct. 30, 1979) (remarks of Sen. 
DeConcini).

 The House version called instead for review by the Judicial 
Conference. When it was returned to the Senate, Senator 
DeConcini expressed regret that the "Court" envisaged by 
the Senate bill had not survived. But he recognized the close 
similarity between review by that "Court" and by the Judicial 
Conference (or a standing committee thereof):

 Today's compromise substitute amendment is at least 
 close to what was originally envisioned by the Senate this 
 Congress, in that a permanent, independent standing 
 committee of the judicial conference is authorized to be 
 established. Such a body, while not an independent 
 review court, will provide for uniformity of decisions and 
 the building of precedents.
 
126 Cong. Rec. 28,090/2 (Sept. 30, 1980) (remarks of Sen. 
DeConcini).

 Indeed, it is not clear whether there is any material 
difference between the two. In both cases, of course, the 
persons conducting the review are exclusively Article III 
judges. In both cases review is discretionary. 126 Cong. 
Rec. 28,092/3 (Sept. 30, 1980). Speaking of the Judicial 
Conference review, Senator DeConcini observed: "It is envi-
sioned that over the long term these petitions will develop 
into something like petitions for writs of certiorari to the 
Supreme Court of the United States." Id.

 It seems fair to suppose that both houses of Congress 
realistically expected that the Judicial Conference would hear 
all serious claims. Indeed, explaining its rejection of the 
Senate proposal for a new court, the House Judiciary Com-
mittee only expressed concern that its formal character would 
unduly invite complaints against judges and thereby threaten 
judicial independence:

 In essence, the Committee rejected the special court 
 feature of S. 1873 and certain other of its features 
 because creation of a system in which complaints against 
 federal judges could be so easily pressed to a formal 
 adversary accusatorial proceeding raised the dangers of 
 a substantial chilling effect on judicial independence, as 
 
 well as the danger of infliction of harm and disruption of 
 the administration of justice.
 
H.R. Rep. No. 96-1313, at 18 (1979). The only discussion of 
the matter on the floor was the observation that "[t]here is 
also an appellate procedure which culminates in the Judicial 
Conference of the United States." 126 Cong. Rec. 25,370/3 
(Sept. 15, 1980) (remarks of Rep. Gudger). Thus the House's 
expectations for review appear to be entirely consistent with 
those of the Senate. Only the means for providing the review 
were altered, and the shift seems to be due to a greater, not 
lesser, solicitude for judges' constitutional rights and inter-
ests.

 Later developments seem to suggest that the risks the 
compromise sought to constrain were indeed substantial. Ac-
cording to the Administrative Office of the U.S. Courts, the 
year ending September 30, 2000 saw 696 complaints filed 
under s 372(c). During the same period, 715 complaints 
were concluded. Chief judges dismissed 359 complaints and 
judicial councils dismissed 354 more. Only two resulted in 
public censure and 162 remain pending.4 Defending against 
these claims is disruptive and potentially expensive. See 
App. Br. at 52. Congress sought in the Act to give the 
judiciary the power to "keep its own house in order" by 
conducting its own investigations of misconduct. See S. Rep. 
No. 96-362, at 11, reprinted in 1980 U.S.C.A.A.N. at 4325. 
By adding review preclusion, they limited the potential dis-
ruption, while providing for adequate review in those few 
cases that might require it.

 We note that the Judicial Conference committee has dis-
claimed authority to rule on as applied, as well as facial, 
constitutional challenges:

 We have no competence to adjudicate the facial consti-
 tutionality of the statute or its constitutional application 
 to the speech of an accused judge, however inappropriate 
 
__________
 4 See 2000 Report of the Director, Table S-22, Report of 
Complaints Filed and Action Taken Under Authority of Title 28 
U.S.C. Section 372(c) available online at <http://www.uscourts. 
gov/judbus2000/tables/s22sep00.pdf>, last accessed on June 20, 
2001.

 or offensive his words may be. We are not a court. Our 
 decisions are not subject to review by the Supreme Court 
 of the United States. We sit in review of the action of 
 the Circuit Council. The courts of the United States are 
 open for the adjudication of such questions.
 
Judicial Conference Report at 21, quoting its decision in No. 
84-372-001. The committee offered no reason for this posi-
tion. While we apply deference under Chevron, U.S.A., Inc. 
v. NRDC, 467 U.S. 837 (1984), to agencies' jurisdictional 
decisions, see Transmission Access Policy Study Group v. 
F.E.R.C., 225 F.3d 667, 694 (D.C. Cir. 2000); Oklahoma 
Natural Gas v. FERC, 28 F.3d 1281, 1283-84 (D.C. Cir. 1994), 
the statutory mandate to the committee appears to contain no 
language justifying a decision to disregard claims that a 
circuit judicial council has violated a judge's constitutional 
rights in application of the Act. See s 372(c)(10) (authorizing 
"review" by the Judicial Conference or a standing committee 
thereof). To be sure, agencies ordinarily lack jurisdiction to 
" 'adjudicat[e] ... the constitutionality of congressional enact-
ments,' " Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 215 
(1994) (quoting Robison, 415 U.S. at 368), "although the rule 
is not mandatory," id. But agencies do have "an obligation to 
address properly presented constitutional claims which ... do 
not challenge agency actions mandated by Congress." Grace-
ba Total Communications, Inc. v. F.C.C., 115 F.3d 1038, 1042 
(D.C. Cir. 1997). See also Meredith Corp. v. F.C.C., 809 F.2d 
863, 872-74 (D.C. Cir. 1987). We can see neither any reason 
why Congress would have withdrawn that power and obli-
gation from a reviewing "agency" composed exclusively of 
Article III judges nor any indication that it has done so.

 Thus Congress in the end enabled a sanctioned judge to 
seek review by Article III judges of the Judicial Conference 
of all claims except (presumably) facial attacks on the statute. 
As a result, to read s 372(c)(10) to allow review of constitu-
tional as-applied claims by conventional courts as well would 
generate substantial redundancy, an implausible legislative 
purpose. Moreover, whereas the legislative history of the 
statutes at issue in Griffith and Ungar reflected a "silent" or 

unexplained deletion of an exception for constitutional claims, 
see Dissent at 9-10, here Congress explained the deletion of 
the Senate's formal Article III court. The less formal ver-
sion, the House Judiciary Committee thought, would be more 
protective of sanctioned judges, because the Senate solution 
risked generation of "formal adversary accusatorial proceed-
ing[s]" that would "raise[ ] the dangers of a substantial chill-
ing effect on judicial independence." H.R. Rep. No. 96-1313, 
at 18 (1979). Although the difference in fact seems to us 
largely cosmetic, the House-induced change seems entirely 
consistent with the Senate's plan that review should cease 
once a single Article III panel, drawn from the Judicial 
Conference, had passed on the work of the sanctioning circuit.

 In short, we find the evidence clear and convincing that 
Congress intended s 372(c)(10) to preclude review in the 
courts for as applied constitutional claims. Members of Con-
gress were aware of Robison and more generally of doctrines 
presuming access to Article III review of decisions impinging 
on important interests. Put ultimately to a choice between 
review by an Article III "Court" and review by a committee 
of Article III judges chosen by and from the Judicial Confer-
ence, they chose the latter. They did so in order to protect 
judges from the "chilling" effects of unnecessary complaints, 
not with any expectation that the Judicial Conference would 
scant judges' rights.

 Vesting the power to review facial attacks on the Act in the 
courts conforms fully to Robison; but reserving to the Judi-
cial Conference committee exclusive authority over as applied 
constitutional challenges fulfills both the presumption in favor 
of access to Article III review of constitutional claims and the 
norm requiring "agencies" to avoid unconstitutional applica-
tions not mandated by Congress, at the same time as it 
prevents undue prolongation of the disciplinary process. Ac-
cordingly, we find that in s 372(c)(10) Congress clearly and 
convincingly barred our review of Judge McBryde's claim of 
unconstitutional application of the Act.

 We are left only with the two claims that defendants 
exceeded their statutory authority--the objections that the 
investigation impermissibly swelled beyond the scope of the 

initial complaints and that the Judicial Council sanctioned 
Judge McBryde for the merits of his decisions. Judge 
McBryde seeks an exception to the jurisdictional limitation 
for these claims under Leedom v. Kyne, 358 U.S. 184 (1958). 
But Kyne involved preclusion that had been inferred from the 
National Labor Relations Act, and is therefore merely an 
application of the familiar requirement that there be "clear 
and convincing evidence" of legislative intent to preclude 
review. See Board of Governors v. MCorp Financial, Inc., 
502 U.S. 32, 44 (1991) (internal citations omitted). Judge 
McBryde also seeks an exception allowing review under Dart 
v. United States, 848 F.2d 217 (D.C. Cir. 1988), where this 
court reviewed an agency action despite an explicit preclusion 
provision. But Dart stands for the exceedingly narrow prop-
osition that a statute precluding review is limited by its 
language. "[T]he Veterans' Administrator cannot issue oil 
drilling permits--nor can the Secretary of Labor rescind 
television licenses--and expect to escape judicial review by 
hiding behind a finality clause." Id. at 224. Thus, in Dart 
itself we found that the Secretary of Commerce's order 
reversing an administrative law judge's decision did not enjoy 
the preclusion that the statute afforded an order to "affirm, 
modify or vacate" the ALJ's decision. See id. at 227-31. But 
Dart cannot mean that statutory insulation of a specific type 
of "order" from review is automatically ineffective whenever 
the complainant asserts legal error. And that is the most 
Judge McBryde claims here.

 His complaint expansion theory is that the actions taken 
against him were not based on the merits of any properly 
filed or identified complaint, as provided for by 28 U.S.C. 
s 372(c)(1). Subparagraph (c)(4)(A) gives the chief judge the 
power to form a special committee "to investigate the facts 
and allegations contained in the complaint." Absent a com-
plaint, we may assume, the Judicial Council could not make a 
valid order under paragraph (c)(6). Accordingly, Judge 
McBryde argues that Circuit Rule 9(A), which allows a special 
committee to expand the scope of an investigation, is invalid; 
on that account, he claims, we do not have before us an 
"order" of the sort for which judicial review is barred by 

s 372(c)(10). But s 372(c)(5) explicitly gives a special com-
mittee the authority to "conduct an investigation as extensive 
as it considers necessary," and s 372(c)(1) states that a valid 
written complaint may be made by "any person." 28 U.S.C. 
ss 372(c)(1) & (5). Thus Judge McBryde's objection reduces 
to arguments as to the exact reach of these provisions. 
Treating such a claim as involving a deficiency that would 
strip the defendants' acts of the character of "orders" for 
purposes of s 372(c)(10) would obliterate the section altogeth-
er.

 Judge McBryde's statutory merits-relatedness claim also 
falls short. The Act itself is permissive when it comes to the 
investigation of claims that are related to the merits. The 
chief judge, under s 372(c)(3) "may" dismiss a complaint if he 
finds the complaint is "directly related to the merits of a 
decision or a procedural ruling." A finding of merits relation 
does not prohibit the chief judge from appointing a special 
committee and therefore does not undermine the validity of 
the action of the Special Committee or the Judicial Council 
for the purposes of s 372(c)(10). Had the Fifth Circuit 
Judicial Conference promulgated a rule specifically calling for 
the investigation of the merits of decisions, such a rule might 
conceivably be challenged under Traynor, 485 U.S. at 541-45 
(allowing review of claim that an agency regulation was 
invalidated by a statute not committed to that agency's 
exclusive administration). But no such rule exists in this 
case, and Judge McBryde has stated his objection only in the 
most general terms. Nowhere does he suggest that the 
Judicial Council's action has the character of a rule, or 
suggest an exception under Traynor, or even suggest which 
statutory provision such a rule would run afoul of. Again, it 
is plain that the statutory error asserted (if error it be) is not 
the sort that under Dart would deprive the defendants' 
orders of the status of "orders and determinations" covered 
by s 372(c)(10), or otherwise escape its preclusive effect.

 * * *

 Judge McBryde makes two related facial constitutional 
challenges that survive both mootness and preclusion. First, 

he reads the clause vesting the impeachment power in Con-
gress as precluding all other methods of disciplining judges; 
on this theory, the Act violates separation of powers doctrine. 
Second, he says that the principle of judicial independence 
implicit in Article III bars discipline of judges for actions in 
any way connected to his actions while on the bench.

 The issues are of course linked, as the great bulwarks of 
judicial independence are the guarantees of life tenure and 
undiminished salary during good behavior. For Judge 
McBryde, the fact that individual judges are the direct benefi-
ciaries of these guarantees proves that it is the individual 
judge that is the relevant unit of judicial independence. 
While this perspective has had its supporters, see Chandler v. 
Judicial Council of the Tenth Circuit, 398 U.S. 74, 129-43 
(1970) (Douglas, J., and Black, J., dissenting); Hastings I, 770 
F.2d at 1106-07 (Edwards, J., concurring); but see Harry T. 
Edwards, Regulating Judicial Misconduct and Divining 
"Good Behavior" for Federal Judges, 87 Mich. L. Rev. 765, 
785 (1989), the cases speak almost exclusively to judicial 
independence from the influence or control of the legislative 
and executive branches. See Mistretta v. United States, 488 
U.S. 361, 382 (1989) ("the Framers 'built into the tripartite 
Federal Government ... a self-executing safeguard against 
the encroachment or aggrandizement of one branch at the 
expense of the other.' ") (quoting Buckley v. Valeo, 424 U.S. 1, 
122 (1974)); United States v. Will, 449 U.S. 200, 217-18 (1980) 
("[a] Judiciary free from control by the Executive and Legis-
lature"); The Federalist No. 78 (Hamilton). After all, "Arti-
cle III creates[ ] not a batch of unconnected courts, but a 
judicial department composed of 'inferior Courts' and 'one 
supreme Court.' " Plaut v. Spendthrift Farm, Inc., 514 U.S. 
211, 227 (1995) (emphasis in original).

 That individual judges are direct beneficiaries of the tenure 
and salary protections of Article III by itself hardly shows 
that the overarching purpose of these provisions was to 
insulate individual judges against the world as a whole (in-
cluding the judicial branch itself), rather than, as the cases 
above indicate, to safeguard the branch's independence from 
its two competitors. For support of his view Judge McBryde 

points to a footnote from Northern Pipeline Const. Co. v. 
Marathon Pipe Line Co., 458 U.S. 50 (1982), in which the 
Court said that the two guarantees "serve other institutional 
values as well," among them "insulat[ing] the individual judge 
from improper influences not only by other branches but by 
colleagues as well." Id. at 59 n.10. But the primary value 
the Court asserted was "to ensure the independence of the 
Judiciary from the control of the Executive and Legislative 
Branches of government." Northern Pipeline, 458 U.S. at 59. 
The conclusion that other values are also in play is a far cry 
from Judge McBryde's argument that the individual judge 
must be constitutionally sheltered not merely from removal 
and salary diminution but also from lesser sanctions of every 
sort. Lesser sanction are common, as the Court has noted:

 Many courts ... have informal, unpublished rules which 
 ... provide that when a judge has a given number of 
 cases under submission, he will not be assigned more 
 cases until opinions and orders issue on his 'backlog.' 
 These are reasonable, proper, and necessary rules, and 
 the need for enforcement cannot reasonably be doubted.
 
Chandler, 398 U.S. at 85. As there is no basis for Judge 
McBryde's core assumption that judicial independence re-
quires absolute freedom from such lesser sanctions, his two 
claims fall swiftly.

 Judge McBryde frames his separation of powers claim as 
whether the Constitution "allocates the power to discipline 
federal judges and, if so, to which branches of government." 
App. Br. at 54. Finding that it allocates the power to 
Congress in the form of impeachment, he concludes that it 
excludes all other forms of discipline. But Judge McBryde's 
attempt to fudge the distinction between impeachment and 
discipline doesn't work. The Constitution limits judgments 
for impeachment to removal from office and disqualification 
to hold office. U.S. Const. art. I, s 3, cl. 7. It makes no 
mention of discipline generally. The Supreme Court recently 
observed that it accepted the proposition that "[w]hen a 
statute limits a thing to be done in a particular mode, it 
includes a negative of any other mode." Christensen v. 

Harris County, 529 U.S. 576, 583 (2000) (internal citations 
omitted). But application of the maxim depends on the 
"thing to be done." Here the thing to be done by impeach-
ment is removal and disqualification, not "discipline" of any 
sort.

 The Constitution itself preserves criminal prosecution, see 
U.S. Const. art. I, s 3, cl. 7 ("the Party convicted shall 
nevertheless be liable and subject to Indictment, Trial, Judg-
ment and Punishment, according to Law"), and at least three 
circuits have held that prosecution of judges can precede 
impeachment. See United States v. Claiborne, 727 F.2d 842, 
845 (9th Cir. 1984); United States v. Hastings, 681 F.2d 706, 
710 (11th Cir. 1982); United States v. Isaacs, 493 F.2d 1124, 
1140-44 (7th Cir. 1974). Even Justices Douglas and Black, 
who dissented in Chandler from the Court's narrowly framed 
denial of relief for a district judge whose colleagues had 
limited his case assignments, acknowledged that judges were 
subject to criminal prosecution. See Chandler 398 U.S. at 
140 ("If they break a law, they can be prosecuted. If they 
become corrupt or sit in cases in which they have a personal 
or family stake, they can be impeached by Congress.") (Doug-
las, J., dissenting); id. at 141-42 ("[J]udges, like other people, 
can be tried, convicted, and punished for crimes.") (Black, J., 
dissenting).

 Judge McBryde accepts that judges are subject to prosecu-
tion, but argues that impeachment nonetheless excludes disci-
pline of judges by judges. In yet another attempt to prove 
his individualized idea of judicial independence, he points to 
Hamilton's statement in Federalist No. 79 that: "The precau-
tions for [judges'] responsibility are comprised in the article 
respecting impeachments.... This is the only provision on 
the point, which is consistent with the necessary indepen-
dence of the judicial character, and is the only one which we 
find in our own Constitution in respect to our own judges." 
The Federalist No. 79 at 532-33 (Hamilton) (Jacob E. Cooke, 
ed., 1961) (emphasis added). But even if we assume the 
remark embraces not merely removal and disqualification but 
lesser forms of discipline, it does not seem likely to have been 
aimed at intra-branch constraints. Hamilton's concern with 

judicial independence seems largely to have been directed at 
the threat from the two other branches. "I agree that 'there 
is no liberty, if the power of judging be not separated from 
the legislative and executive powers.' " The Federalist No. 
78 at 523 (Hamilton) (Jacob E. Cooke, ed.) (quoting Montes-
quieu). And he famously characterized the judiciary as "the 
least dangerous" branch. Id. at 522. Thus it seems natural 
to read Hamilton as seeing the guarantees of life tenure and 
undiminished compensation, and the limited means for deny-
ing a judge their protection, simply as assuring independence 
for the judiciary from the other branches. The Supreme 
Court has considered the same passage as Judge McBryde 
invokes and so interpreted it: "In our constitutional system, 
impeachment was designed to be the only check on the 
Judicial branch by the Legislature." Nixon v. United States, 
506 U.S. 224, 235 (1993) (some emphasis added).

 Indeed, the Hamiltonian concern for protecting the judicia-
ry from other branches argues for internal disciplinary pow-
ers. Arrogance and bullying by individual judges expose the 
judicial branch to the citizens' justifiable contempt. The 
judiciary can only gain from being able to limit the occasions 
for such contempt. See In re Certain Complaints Under 
Investigation by an Investigating Committee of the Judicial 
Council of the Eleventh Circuit, 783 F.2d 1488, 1507-08 (11th 
Cir. 1986)

 Judge McBryde invokes another element of constitutional 
history--the framers' consideration and rejection of the pro-
posal to vest the impeachment power in the courts, or in some 
combination of judicial and legislative officers. But, as was 
true of the effort to find a negative implication in the Consti-
tution itself, this tells us only what we already knew: that the 
framers lodged the powers of removal and disqualification 
solely in Congress, in the form of impeachment.

 Judge McBryde acknowledges, as he must, that in other 
contexts the impeachment power does not exclude all intra-
branch discipline. In Myers v. United States, 272 U.S. 52 
(1926), the Supreme Court found (in the strongest form--
against a contrary decision by Congress) that the President 

had power to remove civil officers, excluding judges, even 
though Congress would have been able to remove some of the 
same officers only through impeachment. While that power 
is not absolute, its limitation does not depend on the exclusive 
power of Congress to impeach. See Morrison v. Olson, 487 
U.S. 654, 691 (1988)

 Judge McBryde would have us write off the Court's en-
dorsement of executive branch discipline as peculiar to and 
dependent on the executive's hierarchical structure. But the 
question is the implication from the Constitution's vesting of 
impeachment power in Congress. The Constitution makes no 
distinction between judges and other officers. It provides 
only that "all civil Officers of the United States, shall be 
removed from Office on Impeachment." U.S. Const. art. II, 
s 4.

 In short, the claim of implied negation from the impeach-
ment power works well for removal or disqualification. But it 
works not at all for the reprimand sanction, which bears no 
resemblance to removal or disqualification and is the only 
sanction in the case that remains unmoot.5 Thus Judge 
McBryde's textual argument fails. Given the benefits to the 
judiciary from intra-branch efforts to control the self-
indulgence of individual judges, we see no basis for inferring 
structural limits on Congress's enabling such efforts.

 Judge McBryde's second facial claim is that the Constitu-
tion, even assuming it does not altogether bar intra-judicial 
sanctions (other than by appeal, mandamus, etc.), flatly bars 
any such sanction for "anything to do with anything that 
happened when the judge ... was acting and deciding cases 
or in any phase of the decisional function." Oral Arg. Tr. at 
17-18. His counsel was quite explicit that this would include 
a judge's nakedly racist disparagement of counsel, id. at 9, 
indeed, "anything that the judge does verbally or physically 
in the course of adjudication," id. at 8. Asked whether this 
would include punching counsel, Judge McBryde's counsel 

__________
 5 Obviously, we do not decide whether a long-term disqualifica-
tion from cases could, by its practical effect, affect an unconstitu-
tional "removal."

suggested that criminal proceedings at state law would supply 
an ample remedy. Id. at 9.

 It may help put Judge McBryde's theory in perspective to 
look at one of the many episodes that led to the present 
sanctions. In 1992, Judge McBryde sanctioned a lawyer 
appearing before him for failing to have her client attend a 
settlement conference in violation of Judge McBryde's stan-
dard pretrial order, which required all principals to attend 
the conferences. Counsel represented a corporation and its 
employee, defendants in a suit in which plaintiffs, a woman 
and her 10-year old daughter, had alleged sexual harassment. 
One of the allegations was that the individual defendant "had 
terrorized the 10-year old ... by popping out his glass eye 
and putting it in his mouth in front of her." Committee 
Report at 19. The lawyer thought the presence of the 
individual defendant would be counter-productive to settle-
ment efforts; the individual had no assets and had given her 
full authority to settle. See id. at 20.

 After chastising the lawyer, Judge McBryde required that 
she attend a reading comprehension course and submit an 
affidavit swearing to her compliance. See id. at 20. The 
attorney submitted an affidavit attesting to the fact that she 
found a course and attended for three hours a week for five 
weeks. Judge McBryde challenged her veracity and required 
that she submit a supplemental affidavit "listing 'each day 
that she was in personal attendance at a reading comprehen-
sion course in compliance with [the] court's order; the place 
where she was in attendance on each date; the course title of 
each course; how long she was in attendance on each day; 
and the name of a person who can verify her attendance for 
each day listed.' " Id. at 22. She complied. The Special 
Committee characterized this incident as reflecting a "gross 
abuse of power and a complete lack of empathy." Id. at 18. 
Judge McBryde tells us that the defendants unconstitutional-
ly impugn judicial independence when they express a formal, 
institutional condemnation of this sort.

 We assume arguendo that the procedures of the Act may 
not constitutionally be used as a substitute for appeal. But 

Judge McBryde's theory plainly goes well beyond judicial 
acts realistically susceptible of correction through the avenues 
of appeal, mandamus, etc. Appeal is a most improbable 
avenue of redress for someone like the hapless counsel blud-
geoned into taking reading comprehension courses and into 
filing demeaning affidavits, all completely marginal to the 
case on which she was working. Possibly she could have 
secured review by defying his orders, risking contempt and 
prison. But we are all at a loss to see why those should be 
the only remedies, why the Constitution, in the name of 
"judicial independence," can be seen as condemning the judi-
ciary to silence in the face of such conduct. Counsel punched 
out by the judge could not even pursue a remedy by risking 
contempt, of course, since the punch involves no judicial order 
that he could disobey.

 The Court said in Chandler, in dictum to be sure:

 There can, of course, be no disagreement among us as to 
 the imperative need for total and absolute independence 
 of judges in deciding cases or in any phase of the 
 decisional function. But it is quite another matter to say 
 that each judge in a complex system shall be the absolute 
 ruler of his manner of conducting judicial business.
 
398 U.S. at 84. As we noted above, we see nothing in the 
Constitution requiring us to view the individual Article III 
judge as an absolute monarch, restrained only by the risk of 
appeal, mandamus and like writs, the criminal law, or im-
peachment itself. We thus reject Judge McBryde's facial 
constitutional claims.

 * * *

 The process of construing s 372(c)(10) led us to raise and 
answer the question whether the Review Committee was 
authorized to entertain Judge McBryde's constitutional as-
applied challenges, and we concluded that it was. The Com-
mittee, as we noted, has given a contrary answer. As we 
read s 372(c)(10) to deny us the authority to review any 
aspect of the decisions about Judge McBryde other than the 
facial constitutional claims, we have no authority to mandate 

the Committee's consideration of the as applied claims. We 
believe, nonetheless, that the Review Committee should re-
consider its view in light of our opinion and we therefore 
request it to do so.

 * * *

 Accordingly, the judgment of the district court as to the 
one-year and three-year suspensions is vacated and the judg-
ment as to the reprimand is affirmed.

 So ordered.

 Tatel, Circuit Judge, concurring in part and dissenting in 
part: I agree with the court in many respects: that Judge 
McBryde's challenge to the reprimand is not moot; that the 
Judicial Councils Reform and Judicial Conduct and Disability 
Act of 1980 is not facially unconstitutional; and that the Act 
bars us from reviewing Judge McBryde's statutory claims. I 
do not agree, however, that the Act precludes us from review-
ing Judge McBryde's as-applied constitutional claims. I 
would therefore have reached those claims and, because I 
think one claim has merit, reversed the district court and 
directed that the matter be remanded to the Fifth Circuit 
Judicial Council for further proceedings. Although the Coun-
cil's Report finds that Judge McBryde engaged in some 
clearly egregious and sanctionable conduct, the Report also 
describes judicial conduct that was either less clearly abusive 
or apparently quite appropriate, and the Report never ade-
quately explains how--or even in some instances whether--
such behavior rises to the level of a clear abuse of judicial 
power. The Report thus leaves open the possibility that 
Judge McBryde was sanctioned in part for behavior that was 
not at all abusive. In addition, because the Report is impre-
cise and leaves much conduct unexplained, using the Report 
as a basis for sanctions risks chilling other district judges' 
ability to manage their courtrooms effectively. I thus believe 
that the Council's actions amounted to an unconstitutional 
infringement of judicial independence.

 I

 This case has its origins in a prior dispute between Judge 
McBryde and his colleagues over certain case assignments. 
In late April and early May of 1995, Chief Judge Buchmeyer 
of the Northern District of Texas reassigned two cases, 
United States v. Satz, No. 4:94-CR-094-R (N.D. Tex.) and 
Torres v. Trinity Industries, Inc., No. CA4-90-812-A (N.D. 
Tex.), from Judge McBryde to himself. The reassignments 
responded to Judge McBryde's allegedly "unwarranted" and 
"abusive" treatment of attorneys and court personnel. See In 
re John H. McBryde, 117 F.3d 208, 215-18 (5th Cir. 1997). 
In Satz, Judge McBryde had found an Assistant United 
States Attorney in contempt of court for, among other things, 
stating that a sealing order in a related federal case prevent-

ed her from answering certain of Judge McBryde's questions. 
Judge McBryde believed, erroneously as it turned out, that 
no such order existed. Id. at 213. Torres involved corre-
spondence between Judge McBryde and the clerk of the court 
over an administrative error that had resulted in a court-
approved settlement not being implemented. Judge 
McBryde wrote that a letter from the clerk had been "so 
unprofessional and so disrespectful ... that it borders on, if it 
does not constitute, contempt of court." Id. at 215.

 After Chief Judge Buchmeyer reassigned the two cases, 
Judge McBryde filed a Request for Assistance with the Fifth 
Circuit Judicial Council. Id. at 217. Fifth Circuit Chief 
Judge Politz referred the matter to a Special Investigatory 
Committee composed of himself, two fellow circuit judges, 
and two district judges. Id. Following several days of 
hearings, the Special Committee, relying on section 332 of the 
Act, upheld the reassignment, finding that "Judge McBryde's 
conduct in both cases was unwarranted." Id. Judge 
McBryde's attack on the AUSA and a second government 
official involved in Satz "and his accusations against them of 
lying and contempt of court," the Committee concluded, 
"were baseless, threatening irreparable damage to [their] 
professional reputations and careers." Id. His attack on the 
clerk of the court was likewise "unwarranted [and] abusive, 
and threatened to damage [her] professional reputation." Id.

 Almost two years later, the Fifth Circuit vacated the 
reassignment order. According to the court, the Council had 
no authority "to censure a judge under [section] 332" of the 
Act or to "order a case reassigned based on its disagreement 
with the district judge's factual findings." McBryde, 117 
F.3d at 229. In reaching its conclusion, the court noted that 
"finders of fact could reasonably defend either side" of the 
dispute, stating explicitly that Judge McBryde "could piece 
together a number of facts that pointed to the larger conclu-
sion that [the AUSA involved in the Satz case] was lying," 
that the Judge "delivered a cogent statement of his reasons 
for rejecting [the AUSA's] reliance on a broad sealing order," 
that "[w]e need not attribute paranoia or irrationality to 
Judge McBryde to explain his view that [the AUSA's] conten-

tions about the sealing order were untruthful," and that 
"Judge McBryde's understanding of the factual basis for 
suspecting that [the court clerk in Torres] was on the verge of 
contempt was similarly within the bounds of reason." Id. at 
218-19.

 Meanwhile, shortly after Judge McBryde had requested 
the Judicial Council's assistance and long before the Fifth 
Circuit vacated the Special Committee's reassignment deci-
sion, Chief Judge Politz referred two complaints of miscon-
duct against Judge McBryde (one of which involved the 
Judge's conduct in Satz) to the Special Committee, with 
directions to investigate and report on them. Report of the 
Special Committee of the Fifth Circuit Judicial Council 
Regarding Complaints Against, and the Investigation into 
the Conduct of, Judge John H. McBryde at 1 (Dec. 4, 1997). 
According to the Committee's eventual Report, Committee 
members were from the outset "concerned about two things: 
first, that Judge McBryde [might] have a health problem 
(physical or mental) which affect[ed] his activities as a judge, 
and second, that Judge McBryde ha[d] engaged in a pattern 
of abusive behavior as a federal judge." Id. at 3.

 Pursuing its suspicions that Judge McBryde might suffer 
from a psychiatric disorder, the Committee submitted certain 
materials concerning Judge McBryde to two psychiatrists, 
asking the doctors whether a psychiatric examination of the 
Judge was warranted. Report at 3. When both doctors 
answered yes, the Council engaged in a series of ultimately 
unsuccessful efforts to get Judge McBryde to undergo such 
an examination. Id. In the meantime, the Special Commit-
tee learned about "more and more instances of allegations of 
repetitive, abusive and excessive conduct by Judge McBryde 
beyond the allegations in the ... complaints." Id. at 8. 
Therefore, invoking section 372(c)(5) of the statute, the Spe-
cial Committee "decided to broaden its investigation" to en-
compass incidents from throughout Judge McBryde's judicial 
career. Id. In August, September, and October of 1997, the 
Committee held nine days of evidentiary hearings in New 
Orleans and Fort Worth. Id. at 9. Fifty-five witnesses 

testified, including federal district court judges, a state court 
judge, government and private attorneys who had practiced 
before or had contact with Judge McBryde, court personnel, 
former jurors who had served in Judge McBryde's courtroom, 
and current and former members of the Judge's staff. Id. at 
9-10.

 Based on this evidence, the Committee prepared a Report, 
the bulk of which set forth details concerning twenty-two 
separate incidents involving Judge McBryde's dealings with 
lawyers, fellow judges, a state judge, and the clerk of the 
court. Report at 10-107. Although these include some obvi-
ously abusive and serious incidents, see, e.g., Maj. Op. at 24, 
the Report also includes several incidents that appear to be 
relatively trivial examples of a judge controlling a trial or of 
friction among judicial colleagues. For example, the Report 
describes an incident in which Judge McBryde, responding to 
defense counsel's claim that a prosecutor should have dis-
closed certain financial schedules, accused the prosecutor of 
adopting "a sort of cat-and-mouse approach to discovery." 
Id. at 50. The judge neither dwelled on the matter nor 
imposed sanctions. Id. In another incident (that occurred in 
a parking lot), Judge McBryde became angry and lashed out 
at a fellow judge who had joked about the Judge's impatience. 
Id. at 101-03. On still another occasion (at a judges' meet-
ing), Judge McBryde called two fellow judges "despicable." 
Id. at 103-04. Similar incidents appear throughout the Re-
port: Judge McBryde was "not always solicitous of his fellow 
judges' needs or feelings" with respect to use of courtrooms, 
id. at 106; on learning that the lead public defender on a case 
was engaged in another courtroom, Judge McBryde attempt-
ed to proceed with the case "[r]ather than calling another 
matter on the docket," id. at 24; in a private, one-on-one 
meeting with the Federal Public Defender, Judge McBryde 
stated that he was "concerned" about the relationship be-
tween public defenders and U.S. Attorneys, indicating that he 
"suspected" that defenders and U.S. Attorneys were engaged 
in a " 'collusive effort' to subvert the Sentencing Guidelines," 
id. at 42.

 The Report describes other conduct that, though apparent-
ly more abusive, might nonetheless be entirely appropriate 
under certain circumstances. For example, the Report re-
counts several instances in which Judge McBryde accused 
attorneys of bad faith, sometimes sanctioning them and some-
times not. See, e.g., Report at 10-15, 15-18, 36-42. The 
Report also mentions two occasions on which Judge McBryde 
criticized an entire office. See id. at 17-18 ("I have perceived 
on more than one occasion recently that members of the 
Federal Public Defender's Office are less than candid with 
the court."); id. at 38 ("I just have the feeling that the Civil 
Section of the U.S. Attorney's office here in Fort Worth is not 
always candid with the Court....").

 The Report also examines Judge McBryde's trial rules and 
enforcement techniques. According to the Report, the Judge 
uses strict trial rules, including "the requirement that parties 
enter into ... stipulation[s] with respect to ... every uncon-
tested fact in [a] case," which are then "read seriatim to the 
jury at the beginning of the case and may not be referred to 
again later in the proceeding," and a "prohibition on asking 
questions on cross-examination similar to questions asked of 
[witnesses] on direct examination." Report at 107-08. Quot-
ing from transcripts in two cases, the Report states that 
"Judge McBryde's manner of enforcing his rules is harsh and 
often humiliating." Id. at 110. The Report describes the 
testimony of several witnesses who stated that the combina-
tion of Judge McBryde's rules and his manner of enforcing 
them creates an "oppressive and intimidating atmosphere 
that pervades Judge McBryde's courtroom," id. at 116, and 
has a "chilling effect" on these lawyers' ability to present 
their cases effectively, id. at 121. This kind of enforcement, 
the Report says, formed a "pattern" that had not changed 
despite appellate criticism. Id. at 122. Because of the 
chilling effect of Judge McBryde's rules and his manner of 
enforcement, the Report concludes that attorneys, fearing 
humiliation or embarrassment, forego actions they believe are 
in their clients' best interests and fail to preserve issues for 
appeal. These problems, the Report notes, are difficult to 
correct through the appellate process. Id. at 121-22.

 The Report acknowledges that some of Judge McBryde's 
former staff testified that he was "cordial and considerate in 
his dealings with them," and that several lawyers who testi-
fied on the Judge's behalf stated that he "prepares thorough-
ly, addresses motions promptly, ... writes scholarly opinions 
on difficult legal questions," and moves cases through his 
docket expeditiously. Report at 123-24. Although acknowl-
edging that these witnesses were comfortable practicing in 
front of Judge McBryde and thought that he was fair, id. at 
113-15, the Committee concluded that just because "it is 
possible for some attorneys ... to adapt to Judge 
McBryde's rules is not a vindication of these rules. The 
weight of evidence presented during the hearings convinces 
the Committee that Judge McBryde imposes unduly stringent 
rules on advocates and enforces these rules in an often harsh 
manner." Id. at 115-16.

 Based on all of this evidence, the Report concludes (1) that 
"many of these individual instances, together with the pat-
terns demonstrated over the years surveyed," indicate that 
Judge McBryde had "engaged in conduct prejudicial to the 
effective administration of the business of the courts," and (2) 
that Judge McBryde's "pattern of abusive behavior ... has 
brought disrepute upon the federal judiciary." Report at 150. 
The Report recommends that the Council ask Judge 
McBryde to resign, and if he refused, that it impose the three 
sanctions--a reprimand and two suspensions--described in 
the court's opinion. Maj. Op. at 3. The recommended repri-
mand states that Judge McBryde's "intemperate, abusive and 
intimidating treatment of lawyers, fellow judges, and others 
ha[d] detrimentally affected the effective administration of 
justice ... in the Northern District of Texas," and that 
Judge McBryde had "abused judicial power, imposed unwar-
ranted sanctions on lawyers, and repeatedly and unjustifiably 
attacked individual lawyers and groups of lawyers and court 
personnel," thus having a "negative and chilling impact on the 
Fort Worth legal community," among other things "prevent-
ing lawyers and parties from conducting judicial proceedings 
in a manner consistent with the norms and aspirations of our 

system" and "harm[ing] the reputation of the court." Id. at 
154.

 Invoking section 372(c)(6) of the Act, the Council imposed 
the three recommended sanctions. Six of the nineteen Coun-
cil members voted against imposing the one-year suspension; 
two voted against the public reprimand; one voted against 
the three-year recusal. Order of the Judicial Council of the 
Fifth Circuit at 1, In re John H. McBryde (Jan. 7, 1998) (No. 
95-05-372-0023).

 Pursuant to the Act, Judge McBryde petitioned the Review 
Committee of the Judicial Conference for review of the 
Council's order. Granting "substantial deference" to the 
Judicial Council's findings of fact, Memorandum and Order of 
the Judicial Conference of the United States at 6, In re 
Complaints of Judicial Misconduct or Disability (Sept. 18, 
1998) (No. 98-372-001), and expressly declining to review any 
of Judge McBryde's constitutional claims, id. at 21, the 
Review Committee rejected the Judge's remaining procedural 
and substantive complaints. Finding the one-year suspension 
justified as a remedial, rather than a punitive, measure, the 
Review Committee revised the Council's sanction in one 
respect: it ordered the suspension terminated if Judge 
McBryde demonstrates that he had "seized the opportunity 
for self-appraisal and deep reflection in good faith and ... 
made substantial progress toward improving his conduct." 
Id. at 27.

 II

 My main disagreement with the court centers on section 
372(c)(10)'s last sentence--the Act's review preclusion clause. 
Unlike my colleagues, I do not believe that this clause pre-
vents us from reaching Judge McBryde's as-applied constitu-
tional claims.

 As the court points out, under both Supreme Court and 
D.C. Circuit precedent, we construe review preclusion clauses 
to prevent review of constitutional claims only when we find 
"clear and convincing" evidence of congressional intent to do 
so. Maj. Op. at 10. Even outside the constitutional context, 

a "general presumption favor[s] judicial review in the absence 
of 'clear and convincing evidence of a contrary legislative 
intent.' " Griffith v. Fed. Labor Relations Auth., 842 F.2d 
487, 490 (D.C. Cir. 1988) (quoting Abbott Labs. v. Gardner, 
387 U.S. 136, 141 (1967)). "The maxim that congressional 
preclusion of judicial review must be 'clear and convincing' 
applies in a particularly rigorous fashion ... when constitu-
tional claims are at stake." Id. at 494. As we said in Ungar 
v. Smith, "[w]hen ... [a] plaintiff seeks to invoke the aid of 
the judicial branch on constitutional grounds, the Supreme 
Court and this court have both indicated that only the clear-
est evocation of congressional intent to proscribe judicial 
review of constitutional claims will suffice to overcome the 
presumption that the Congress would not wish to court the 
constitutional dangers inherent in denying a forum in which 
to argue that government action has injured interests that 
are protected by the Constitution." 667 F.2d 188, 193 (D.C. 
Cir. 1981). See also Webster v. Doe, 486 U.S. 592, 603 (1988) 
("We require this heightened showing in part to avoid the 
'serious constitutional question' that would arise if a federal 
statute were construed to deny any judicial forum for a 
colorable constitutional claim.") (quoting Bowen v. Michigan 
Academy of Family Physicians, 476 U.S. 667, 681 n.12 
(1986)).

 In my view, the requisite "clear and convincing" evidence of 
intent is absent here. As my colleagues acknowledge, section 
372(c)(10) contains no language expressly barring constitu-
tional challenges. See Maj. Op. at 11. Indeed, Congress 
knows how to preclude review of constitutional claims when it 
wants to. For example, the federal statute governing depor-
tation and denaturalization provides that "[j]udicial review of 
all questions of law and fact, including interpretation and 
application of constitutional and statutory provisions, ... 
shall be available only in judicial review of a final order under 
this section." 8 U.S.C. s 1252(b)(9) (emphasis added).

 In Ungar as well as in Ralpho v. Bell, we found statutes 
containing language just as preclusive as section 372(c)(10)'s 
insufficient to bar review of as-applied constitutional claims. 
The statute in Ungar provided that administrative decisions 
are "final" and "not ... subject to review by any court." 667 

F.2d at 193 (internal quotation marks omitted). In Ralpho, 
the statute provided that "[administrative decisions] shall be 
final and conclusive for all purposes, notwithstanding any 
other provision of law to the contrary[,] and not subject to 
review." 569 F.2d 607, 613 (1977). Using equally preclusive 
language, section 372(c)(10) provides that "[a]ll orders and 
determinations [of the Judicial Conference] ... shall be final 
and conclusive and shall not be judicially reviewable on appeal 
or otherwise." 28 U.S.C. s 372(c)(10).

 As my colleagues also note, see Maj. Op. at 11, absent 
express statutory language, our prior opinions have "studied 
the legislative history" in search of a "clear expression of 
Congress's desire to prevent the courts from passing upon 
... constitutional claims," Ungar, 667 F.2d at 196, or an 
"affirmative statement addressed to preclusion of constitu-
tional claims." Griffith, 842 F.2d at 494. Here, as in Ral-
pho, Ungar, and Griffith, the legislative history includes no 
direct comment at all about whether the Act's review preclu-
sion language was meant to cover constitutional challenges. 
See Maj. Op. at 11 ("Of course if the [Griffith] trilogy is read 
to require magic words expressly barring as applied constitu-
tional attacks, they are not to be found.").

 Lacking a clear affirmative statement in the statute's text 
or legislative history, my colleagues infer from the defunct 
Senate version of the Act and its accompanying legislative 
history that Congress intended the preclusion clause to cover 
as-applied constitutional challenges. See Maj. Op. at 11-16. 
Although this is certainly a plausible interpretation of the 
legislative history, both Griffith and Ungar declined to treat 
such inferences from prior versions of bills as sufficiently 
clear evidence of congressional intent to preclude judicial 
review of as-applied claims. In Griffith, the original Senate 
bill provided that most decisions of the Federal Labor Rela-
tions Authority would be "final and conclusive" and not 
subject to further judicial review, but provided an exception 
for "questions arising under the Constitution." 842 F.2d at 
495. The conference committee, rejecting the House's pro-
posal for expansive judicial review and generally adopting the 
Senate's more restrictive approach, dropped "without expla-

nation" the exception for constitutional questions. Id. Nev-
ertheless, observing that circuit precedent required an "affir-
mative statement addressed to preclusion of constitutional 
claims," id. at 494, we held that "[t]his silent deletion [was] 
not enough, under our cases, to support an inference of intent 
to preclude constitutional claims." Id.

 The statute at issue in Ungar provided that Justice Depart-
ment decisions regarding claims for the return of assets 
vested in the Office of Alien Property were not subject to 
judicial review. Deciding that this provision did not preclude 
review of as-applied constitutional claims, we noted that "[a]n 
earlier version of the bill ... included an elaborate scheme 
for trial of just-compensation claims in the Court of Claims," 
which was "deleted on the House floor for reasons that are 
not wholly plain." We were nonetheless "not willing to 
regard this as clear evidence of Congressional intent...." 
667 F.2d at 195 n.2.

 The evidence of legislative intent to preclude judicial review 
that we declined to credit in Griffith and Ungar was, if 
anything, stronger than in this case. In those cases, we 
found legislative history insufficiently clear and convincing to 
preclude as-applied challenges even though the original ver-
sions of the statutes at issue allowed review of constitutional 
questions, while the final versions eliminated such provisions, 
suggesting a movement toward precluding such review. 
Here, by contrast, the legislative history suggests movement 
away from preclusion. Senator DeConcini, one of the Act's 
primary sponsors, introduced a Report prepared by Johnny 
H. Killian, an American law specialist at the Library of 
Congress, suggesting that under Supreme Court precedent, 
Congress can safely preclude judicial review of constitutional 
claims so long as "litigants at some point [have] access to an 
Article III court." 125 Cong. Rec. 30,050 (1979) (statement of 
Sen. DeConcini). Senator DeConcini's bill provided for re-
view of disciplinary decisions by a newly created, five-judge 
Article III Court of Judicial Conduct and Disability. Id. 
Later House revisions shifted review from the five-judge 
court to the Judicial Conference. In doing so, the House 
Judiciary Committee emphasized that it was moving from a 

"court" to an "administrative model." Compare H.R. Rep. 
No. 96-1313, at 4 (1980) ("[R]ather than creat[ing] luxurious 
mechanisms such as special courts and commissions--with all 
the trappings of the adversary process, including legal coun-
sel, written transcripts, discovery and cross examination--the 
[House version of the bill] emphasize[s] placing primary 
administrative responsibility within the judicial branch of 
government.") with id. at 14 (stating that this "legislation 
creates much more of an 'inquisitorial-administrative' model 
than an 'accusatorial-adversary' one"). When the Act re-
turned to the Senate, Senator DeConcini made the same 
point, explaining to his colleagues that the Judicial Confer-
ence, unlike the five-judge court proposed in the Senate 
version of the bill, was "not an independent review court." 
126 Cong. Rec. 28,090 (1980) (statement of Sen. DeConcini, 
quoting the Killian Report); see also Chandler v. Judicial 
Council of the Tenth Circuit, 398 U.S. 74, 86 n.7 ("[T]he 
Judicial Council was intended to be ... an administrative 
body functioning in a very limited area in a narrow sense as a 
'board of directors' for the circuit."). Because Congress had 
been informed by the Killian Report that it could safely 
preclude review of constitutional questions only if such review 
was available in an Article III court, and because it had also 
been advised by both Senator DeConcini and the House 
Judiciary Committee that the Judicial Conference was not an 
Article III court, Congress would have understood that vest-
ing power to review disciplinary decisions in the Judicial 
Conference opened those decisions to constitutional attack in 
the federal courts.

 Under all of these circumstances, I do not see how the 
evidence of Congress's intent to preclude as-applied constitu-
tional challenges can be considered clear and convincing--or, 
as we required of legislative history in Griffith, "unusually 
clear." 842 F.2d at 494. Not only did both Griffith and 
Ungar find similar inferences from legislative history insuffi-
cient to meet the clear and convincing standard, but in this 
case, there is an equally plausible--if not more plausible--
interpretation of the legislative history that suggests Con-

gress did not intend to preclude review of as-applied constitu-
tional challenges.

 My colleagues' observation about "substantial redundancy" 
between review performed by the Judicial Conference and 
Article III courts, see Maj. Op. at 15-16, is interesting, but I 
think not dispositive. For one thing, while it is true that the 
two forms of review are both performed by Article III judges, 
I do not agree that they are entirely redundant: decisions of 
Article III courts are reviewable on certiorari by the Su-
preme Court, a distinction of particular importance given the 
constitutional interests at stake here. Even assuming they 
were identical, moreover, such functional redundancy would 
be convincing evidence of Congressional intent only if it were 
the sole form of evidence available, and it isn't. In view of 
Senator DeConcini's statement and the House Judiciary Com-
mittee Report, Congress most likely thought shifting review 
from an Article III court to the Judicial Conference opened 
decisions of the latter to as-applied constitutional challenges 
in the federal courts. In my view, this primary evidence of 
legislative intent outweighs any inferences that might be 
drawn from whatever functional redundancy may exist.

 Finally, my colleagues believe that preclusion of constitu-
tional claims would serve the statutory purpose of "pre-
vent[ing] undue prolongation of the disciplinary process." 
Maj. Op. at 16. But we have twice found review preclusion 
statutes designed to accomplish similar goals insufficient to 
establish clear congressional intent to bar review of as-
applied constitutional claims. See Griffith, 842 F.2d at 495 
(Congress's scheme to limit judicial review of FLRA decisions 
was meant to promote "finality, speed[,] and economy," and 
thus barred district court review of FLRA decisions on 
statutory grounds, but review of as-applied constitutional 
claims nonetheless was not precluded); Ungar, 667 F.2d at 
195-96 (legislative history indicating that review preclusion 
provision was "intended to reduce ... delay in adjudicating 
claims under the Trading with the Enemy Act" was not a 
"clear expression of Congress's desire to prevent the courts 
from passing upon ... constitutional claims").

 III

 Having found no "clear and convincing" evidence that 
Congress intended to preclude review of as-applied constitu-
tional challenges to judicial council sanctions, I would have 
considered the merits of Judge McBryde's as-applied claims. 
In addition to the challenges discussed by the court, see Maj. 
Op. at 18-25, Judge McBryde raises the question whether the 
Judicial Council unconstitutionally interfered with his judicial 
independence by punishing him because it disagrees with his 
judicial philosophy and acts: "Purportedly pursuant to the 
Act, defendants investigated Judge McBryde's performance 
of his judicial functions, requiring him to defend his perfor-
mance and disrupting his judicial activities. They then pun-
ished him, and changed his judicial status, because they 
disapproved of his judicial performance, depriving him of all 
new cases for one year ... and issuing a damning public 
reprimand. Does the Act violate the judicial independence 
doctrine of Article III on its face and as applied?" Appel-
lant's Opening Br. at 2. Answering this question, Judge 
McBryde argues that "the Constitution does not allow agen-
cies to supervise his judging, disagree with his rulings, and 
punish him because his rulings do not meet some 'norm' of 
acceptable judicial conduct." Id. at 52-53. The Judicial 
Conference disagrees: "Given the conduct engaged in and the 
adverse effects on the judicial system in Fort Worth, Texas, 
that conduct had, Appellees submit that it was not unconstitu-
tional to suspend assignment of new cases for up to one year 
for [the Judge] to reflect and to change his conduct." Appel-
lees' Br. at 68-69.

 I agree with my colleagues that the principle of judicial 
independence does not "constitutionally shelter[ ]" Judge 
McBryde from "sanctions of every sort." Maj. Op. at 20. I 
also agree that the creation of a mechanism enabling Judicial 
Councils to sanction judges for things that happened when 
they were "acting and deciding cases" or engaged in some 
other "phase of the decisional function" does not render the 
Act facially unconstitutional. Cf. Chandler, 398 U.S. at 85 
("Many courts--including federal courts--have informal, un-
published rules.... These are reasonable, proper, and nec-
essary rules, and the need for enforcement cannot reasonably 

be doubted. [I]f one judge in any system refuses to abide by 
such reasonable procedures, it can hardly be that the extraor-
dinary machinery of impeachment is the only recourse."). 
For reasons I will explain, however, I do believe that the 
principle of judicial independence permits sanctions to be 
imposed only for conduct that is clearly abusive or clearly 
prejudicial to the adversarial process, and in this case, I think 
that Judge McBryde's conduct, as described in the Council's 
Report, does not uniformly meet this standard.

 As an initial matter, I believe the principle of judicial 
independence guarantees to individual Article III judges a 
degree of protection against interference with their exercise 
of judicial power, including interference by fellow judges. As 
my colleagues note, the Supreme Court expressly stated in 
Northern Pipeline that the constitutional guarantee of life 
tenure "insulates the individual judge from improper influ-
ences not only by other branches but by colleagues as well, 
and thus promotes judicial individualism." Northern Pipe-
line Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 59 
n.10 (1982). Similarly, in Chandler, a case involving intra-
judicial discipline, the Supreme Court stated that "[t]here 
can, of course, be no disagreement among us as to the 
imperative need for total and absolute independence of judges 
in deciding cases or in any phase of the decisional function." 
398 U.S. at 84. See also In re Certain Complaints Under 
Investigation by an Investigating Committee of the Judicial 
Council of the Eleventh Circuit, 783 F.2d 1488, 1506-07 (11th 
Cir. 1986) (noting, in the context of adjudicating the facial 
constitutionality of certain provisions of the Act, that "the 
majority [in Chandler] located a judge's protected indepen-
dence ... 'in deciding cases or in any phase of the decisional 
function,' " and then framing its basic inquiry as "whether 
[the] direct or indirect effects ... the Act may have on an 
individual judge's independence are within proper toler-
ances").

 The notion that individual judges enjoy a sphere of protect-
ed independence finds support in the cases establishing that 
judges cannot be held liable for damages arising out of 
performance of their judicial duties. "[I]t is a general princi-
ple of the highest importance to the proper administration of 
justice," the Supreme Court stated in Bradley v. Fisher, "that 

a judicial officer, in exercising the authority vested in him, 
shall be free to act upon his own convictions, without appre-
hension of personal consequences to himself. Liability to 
answer to every one who might feel himself aggrieved by the 
action of the judge, would be inconsistent with the possession 
of this freedom, and would destroy that independence without 
which no judiciary can be either respectable or useful." 80 
U.S. 335, 347 (1871). Similarly, in Pierson v. Ray, the Court 
stated that "[f]ew doctrines were more solidly established at 
common law than the immunity of judges from liability for 
damages for acts committed within their judicial jurisdic-
tion.... This immunity applies even when the judge is 
accused of acting maliciously and corruptly, and it is not for 
the protection or benefit of a malicious or corrupt judge, but 
for the benefit of the public, whose interest it is that the 
judges should be at liberty to exercise their functions with 
independence and without fear of consequences." 386 U.S. 
547, 553-54 (1967). Cf. Quercia v. United States, 289 U.S. 
466, 469 (1933) ("Under the Federal Constitution the essential 
prerogatives of the trial judge as they were secured by the 
rules of the common law are maintained in the federal 
courts.").

 Of particular relevance to this case, I believe the sphere of 
individual judicial independence--the protected "decisional 
function," as Chandler puts it, 398 U.S. at 84--includes not 
only judges' freedom to reach their own conclusions about 
questions of fact and law, but also a margin of discretion to 
manage and control the adversarial process within their 
courtrooms. "Courts of justice," the Supreme Court has 
explained, "are universally acknowledged to be vested, by 
their very creation, with power to impose silence, respect, and 
decorum, in their presence, and submission to their lawful 
mandates. These powers are governed not by rule or statute 
but by the control necessarily vested in courts to manage 
their own affairs so as to achieve the orderly and expeditious 
disposition of cases." Chambers v. Nasco, Inc., 501 U.S. 32, 
43 (1991) (internal citations and quotations omitted). And as 
we have recognized, the exercise of this power requires that 
"a district judge ha[ve] wide discretion in monitoring the flow 

of a criminal trial. It is well within her discretion to rebuke 
an attorney, sometimes harshly, when that attorney asks 
inappropriate questions, ignores the court's instructions, or 
otherwise engages in improper or delaying behavior.... 
There is a 'modicum of quick temper that must be allowed 
even judges.' " United States v. Donato, 99 F.3d 426, 434 
(D.C. Cir. 1997) (quoting Offutt v. United States, 348 U.S. 11, 
17 (1954)).

 A judge's authority to control the courtroom is essential to 
the exercise of judicial power. Unlike legislative and execu-
tive power, the judicial power created by Article III can be 
exercised only on the basis of a factual record developed 
pursuant to established standards of relevance and authentici-
ty. See Fed. R. Evid. 402 (requiring that evidence be relevant 
to be admissible), 901 (requiring that evidence be authentic to 
be admissible). Critical to the development of a proper 
record is a well-functioning adversarial process in which 
lawyers serve both as zealous representatives of their clients 
and as officers of the court with responsibilities for fairness 
and disclosure that transcend their clients' interests. Unless 
judges can manage this process, if necessary by using both 
formal and informal disciplinary measures to ensure that 
lawyers perform their dual functions effectively and in accor-
dance with established rules of practice and procedure, they 
may lack the fully developed record needed to exercise their 
judicial authority.

 Judges' power to control the adversarial process, of course, 
is not absolute. Inappropriate trial management, for exam-
ple, can undermine a trial's fairness. See, e.g., Offutt, 348 
U.S. at 17 (explaining that trial judge's becoming personally 
embroiled with defense counsel compromised the court's "at-
mosphere of austerity" that is "consonant with a fair trial"); 
Donato, 99 F.3d at 291-92 (finding that judge's failure to 
provide counsel with bench conference outside the jury's 
presence violated Federal Rule of Criminal Procedure 30 and 
constituted prejudicial error); Santa Maria v. Metro-North 
Commuter RR, 81 F.3d 265, 273 (2d Cir. 1996) (finding that a 
trial judge's expressed antipathy toward and removal of trial 
counsel sufficiently prejudiced a defendant so as to require a 

new trial). A judge's abusive treatment of attorneys can 
prevent them from effectively defending their clients' inter-
ests. See In re McConnell, 370 U.S. 230 at 236 (1962) 
("While we appreciate the necessity for a judge to have the 
power to protect himself from actual obstruction in the court-
room ... it is also essential to a fair administration of justice 
that lawyers be able to make honest good-faith efforts to 
present their clients' cases."). Abusive treatment of lawyers 
can undermine the judiciary's reputation, threatening its in-
tegrity in the eyes of the public. Cf. In re Certain Com-
plaints, 783 F.2d at 1507 ("The judiciary as a whole ... has a 
interest in seeing that non-frivolous complaints are looked 
into, to the end that the judge, and the system he exemplifies, 
be exonerated or, if not that the public perceive that the 
system has undertaken to police itself, within constitutional 
limits, of course."); S. Rep. No. 96-362, at 7 (1979), reprinted 
in 1980 U.S.C.C.A.N. 4315, 4321 ("The perception of a viable 
healthy judiciary is of critical importance to our system of 
justice."). As the Supreme Court has said, "an independent 
judiciary and a vigorous, independent bar are both indispens-
able parts of our system of justice." McConnell, 370 U.S. at 
236 (emphasis added).

 It is thus appropriate for Judicial Councils, acting pursuant 
to their general disciplinary power under section 372(c), to 
ensure that judges' trial management techniques do not inter-
fere with the "effective and expeditious administration of the 
business of the courts." 28 U.S.C. s 372(c)(1). After all, 
Congress has authority to "limit[ ]" courts' inherent powers--
including their power to manage trials--"by statute and rule, 
for these courts were created by act of Congress." Cham-
bers, 501 U.S. at 47 (internal quotation marks omitted); see, 
e.g., McConnell, 370 U.S. at 233-34 (noting that Congress has 
limited courts' inherent powers to sanction attorney contempt 
by requiring such sanctions to be no more severe than 
necessary).

 This does not mean that Congress may infringe--or autho-
rize Judicial Councils to infringe--upon judges' trial manage-
ment authority in any manner it sees fit. It is a familiar 
principle that even though Congress has the power to create 

lower federal courts and organize their functioning in certain 
respects, it can neither interfere with nor alter essential 
features of their operation. See, e.g., Plaut v. Spendthrift 
Farms, 514 U.S. 211, 240 (holding that Congress may not 
pass legislation that reopens final judgments of federal 
courts). Having vested authority to conduct trials in individ-
ual district judges, Congress cannot grant Judicial Councils 
the power to interfere with those judges' trial management 
authority to such an extent that judges cannot exercise it 
effectively. Cf. In re Holloway, 995 F.2d 1080, 1088 (D.C. 
Cir. 1993) (observing that absent a judge's ability to control a 
trial with enforceable sanctions, "trials would wander down 
every by-way, no matter how impermissible, in a sprawling 
chaos that would render the adjudication close to random. In 
the long run, such chaos is hardly in the interests of defen-
dants as a whole, much less in the interest of society."). 
Congressional delegation of such authority would also violate 
the principle of separation of powers, which prevents not only 
the aggrandizement of one branch of government at the 
expense of another, but also the disruption by one branch of 
another's essential functions. See Morrison v. Olson, 487 
U.S. 654, 675 (1988) (noting that "separation-of-powers con-
cerns ... would arise" if Congress's power to provide for 
interbranch appointments of inferior officers "had the poten-
tial to impair the constitutional functions assigned to one of 
the branches"); Mistretta v. United States, 488 U.S. 361, 404 
(1989) (stating that the "ultimate inquiry" whether executive 
appointment of Article III judges to administrative posts 
violated separation of powers principles turned on whether 
the "particular extrajudicial assignment undermines the in-
tegrity of the Judicial Branch").

 Thus, while I agree that in order to discourage the improp-
er use of judicial power, protect the fairness of trials, and 
safeguard the integrity and reputation of the judiciary, it is 
appropriate to allow judicial councils to sanction judges for 
abusing their trial management power, I also believe that, to 
prevent such disciplinary action from encroaching upon legiti-
mate and necessary uses of that power, such sanctions should 
be employed only for conduct that, viewed from the perspec-

tive of reasonable judges and lawyers, is clearly abusive 
toward counsel or clearly prejudicial to the adversarial pro-
cess.

 A rigorous standard of this kind is essential for several 
reasons. First, absent such a standard, judicial councils could 
more easily use their disciplinary authority to sanction non-
abusive judicial behavior. Federal judges are not all alike: 
there are as many appropriate courtroom management tech-
niques as there are judges. In any given situation, moreover, 
there will generally be more than one appropriate way to 
manage a trial or demand attorney compliance with court 
orders and rules. One judge may use a light touch to get an 
aggressive lawyer to end an entirely inappropriate line of 
questioning; another judge may threaten sanctions. Allow-
ing judges to punish each other absent evidence of clear 
abuse of counsel or clear damage to the adversarial process 
risks turning judicial discipline into a vehicle for sanctioning 
stylistic disagreements over trial techniques.

 Second, some Judicial Council members, such as appellate 
judges, may have little or no experience dealing with aggres-
sive trial lawyers who routinely test the limits of proper 
advocacy. To such judges, the trial management techniques 
needed to control these lawyers may seem harsh, even abu-
sive. A rigorous standard that restricts sanctions to instanc-
es of clearly abusive behavior will reduce the likelihood that 
councils will sanction appropriate behavior out of inexperi-
ence. And quite apart from the problem of inexperience, 
even judges can act unfairly--indeed vindictively--towards 
colleagues. A rigorous standard will reduce, though of course 
it cannot eliminate, the possibility that judicial discipline will 
be used to sanction unpopular judges engaged in appropriate 
behavior.

 Third, judicial discipline, like civil liability for judicial acts, 
can chill the proper exercise of judicial discretion. See Pier-
son v. Ray, 386 U.S. 547, 553-54 (1967) (holding that imposing 
civil liability for acts committed to judicial discretion "would 
contribute not to principled and fearless decisionmaking but 
to intimidation"); cf. Williams v. United States, 156 F.3d 86, 

91-92 (1st Cir. 1998) ("If chastened attorneys can enlist 
appellate courts to act as some sort of civility police charged 
with enforcing an inherently undefinable standard of what 
constitutes appropriate judicial comment on attorney perfor-
mance, trial judges are more likely to refrain from speaking 
and writing candidly. In our view, this chilling effect carries 
with it risks that are far greater than those associated with 
the evil of occasional overheated judicial commentary."). If 
judges can be sanctioned for conduct that is only arguably or 
possibly--as opposed to clearly--abusive, they may be reluc-
tant to employ stern measures even when necessary to keep 
control of the adversarial process. This is especially true 
because a trial judge's harsh words or tough sanctions, entire-
ly appropriate in the heat of a tense and hard-fought trial, 
may seem abusive when viewed in retrospect through the 
pages of a cold record.

 The possibility of chilling legitimate judicial behavior also 
means that, in cases like this one where judges are sanctioned 
in part for the effect their behavior has on lawyers who 
practice before them, judicial councils should apply an objec-
tive standard, asking not just what complaining lawyers felt, 
but also how the judge's conduct would have affected reason-
able lawyers under similar circumstances. It is only natural 
for lawyers to feel slightly constrained and irritated when 
judges try to control them. If judicial councils fail to apply 
an objective standard when evaluating lawyer reactions and 
complaints, judges might fear discipline if enough disgruntled 
lawyers file complaints or testify against them. Judges might 
thus calibrate courtroom discipline to avoid displeasing law-
yers, refraining from strict measures even when necessary 
and appropriate.

 Finally, we have previously adopted a rigorous standard 
where, as here, sanctions could damage an individual's repu-
tation. In Shepherd v. ABC, we held that courts cannot 
impose discovery sanctions based on attorney misconduct 
without clear and convincing evidence of the predicate wrong-
doing. 62 F.3d 1469, 1476-78 (D.C. Cir. 1995); see also 
Addington v. Texas, 441 U.S. 418, 424 (U.S. 1979) (stating 
that reputational interests "are deemed to be more substan-

tial than mere loss of money and some jurisdictions accord-
ingly reduce the risk to the defendant of having his reputa-
tion tarnished erroneously by increasing the plaintiff's burden 
of proof"). If, because of the risk of imposing reputational 
harm, Article III courts must apply a heightened standard 
when sanctioning lawyers, a similar obligation should apply to 
judicial councils when considering disciplining fellow judges. 
Suspensions and, in particular, reprimands can cast long-
lasting shadows over a judge's career.
 I recognize that under a heightened standard, some abusive judicial conduct
may be unsanctionable. Confining the disciplinary process to clear abuses of judicial power,
however, would not eliminate all means of dealing with less abusive conduct. Judges address
such conduct informally and collegially, and the President and Senate try to ensure that judicial
nominees possess the appropriate temperment to serve as life-tenured federal judges. Although
such efforts may be imperfect, it seems far wiser to tolerate some inappropriate judicial conduct
than to risk chilling appropriate judicial conduct throughout the federal judiciary.
 With these principles in mind, I return to the facts of this 
case.
 IV
 Several incidents described in the Council's Report, such as 
the episode my colleagues recount, e.g., Maj. Op. at 24, are so 
extreme and clearly abusive that, as the Special Committee 
concludes in one instance, they speak for themselves. See 
Report at 23 ("No more need be said with regard to this 
incident."); see also, e.g., id. at 26-30 (describing Judge 
McBryde's sanctioning the entire Federal Public Defender's 
Office because a single attorney could not be reached for 
forty-five minutes due to a misunderstanding); id. at 51-55 
(describing Judge McBryde's berating an Assistant United 
States Attorney and holding him in contempt of court because 
a secretary had trouble connecting all of the parties to a 
conference call); id. at 55-59 (describing Judge McBryde's 
jailing an Assistant Public Defender who refused to answer a 
question he believed might compromise attorney-client privi-
lege); id. at 60-65 (describing Judge McBryde's removing a 
state court judge from McBryde's chambers without inquiring 
why the state court judge was there). Had the Council 
restricted its report to incidents like these, I would have no 
trouble rejecting Judge McBryde's as-applied challenge, for 
no reasonable judge would think behavior like this appropri-
ate.
 Not all of the conduct described in the Report, however, 
falls so clearly outside the bounds of appropriate judicial 
behavior. The Report's main deficiency is that it never 

adequately explains how such apparently less abusive con-
duct--ranging from the "cat-and-mouse" comment to accusa-
tions of lawyer bad faith to Judge McBryde's trial practice 
rules--amounts to a clear abuse, or in some instances even an 
abuse at all, of judicial power. The Report itself acknowl-
edges that at least one incident was "fairly trivial," but 
suggests that "along with other incidents" it was "illustrative 
of a pattern of conduct." Id. at 23. I recognize that trivial 
conduct that would not be abusive if it happened once might 
become so if repeated consistently over time. I also under-
stand that intra-judicial discipline may be an important means 
of addressing patterns of behavior that cannot be corrected 
through informal mechanisms or appellate review. See id. at 
122; Carol Rieger, The Judicial Councils Reform and Judi-
cial Conduct and Disability Act: Will Judges Judge Judges?, 
37 Emory L.J. 45, 78-80 (1988). That said, it is not at all clear 
to me that the more trivial incidents the Report describes, 
even if they occurred persistently, amounted to abuses of 
judicial power. For example, I think it not at all obvious that 
a judge who consistently employed phrases like "cat-and-
mouse approach to discovery," had difficult relations with 
colleagues, or was "not always solicitous of his fellow judges' 
needs or feelings" in the use of courtrooms, would be guilty of 
abusing his judicial power. Although I understand the Com-
mittee's desire to include a sufficient number of incidents to 
establish patterns of conduct, because I think that judicial 
discipline must not interfere with judicial independence, the 
Committee should have restricted its Report to incidents that, 
if occurring repeatedly, would represent clear abuses of judi-
cial power. As it stands, the Report leaves unclear whether 
the patterns formed by these more trivial incidents were at 
all abusive, let alone clearly abusive. If they were abusive, 
the Committee failed to explain why. The Report thus leaves 
open the possibility that Judge McBryde was sanctioned in 
part for legitimate judicial behavior. And absent an explana-
tion of how such conduct constitutes a clear abuse of judicial 
power, imposing sanctions based on this record risks chilling 
legitimate conduct by other judges.

 In the second category of incidents presented in the Re-
port--those involving conduct that, although more clearly 
bordering on the abusive, might nonetheless be entirely ap-
propriate under some circumstances, see supra at 5--I think 
the Committee similarly failed to explain adequately what 
made Judge McBryde's conduct clearly abusive, and thus 
sanctionable. Consider, for example, the Report's description 
of instances in which Judge McBryde accused attorneys of 
bad faith. According to the Report, these incidents form a 
pattern that reveals Judge McBryde's "proclivity to question 
the integrity of attorneys appearing before him." Report at 
124. Yet the Committee fails to establish that these inci-
dents, taken together, were clearly abusive. Much of the 
Report's discussion simply recounts that on several occasions 
Judge McBryde "exhibited distrust of attorneys' motives" and 
"often directly accus[ed] them of lying or conspiring to de-
ceive him." Id. at 124-25. This in itself is unremarkable, 
since evaluating attorney good faith is one of a trial judge's 
functions.

 The Report does suggest, however, that what sets these 
incidents apart is that Judge McBryde's suspicions were 
"unfounded," id. at 150, and that the Judge had "refus[ed] to 
take simple steps to verify whether or not his suspicion of bad 
faith on the part of others [was] justifiable." Id. at 126. I 
agree that a pattern of consistent, unfounded accusations of 
bad faith might well represent a clear, sanctionable abuse of 
judicial power. In explaining why these accusations were 
"unfounded" or otherwise problematic, however, the Commit-
tee gives little or no weight to how things would have looked 
to an objectively reasonable judge in Judge McBryde's posi-
tion. In one case, for example, the Report states that "[w]e 
believe [that an attorney accused of bad faith] told the Special 
Committee the truth" when he testified that he had not lied 
to Judge McBryde, Report at 17 n.4; yet the Report never 
explicitly says whether Judge McBryde himself lacked any 
reasonable basis for believing the lawyer was deceiving him. 
Likewise, when describing the Torres incident, the Report 
criticizes Judge McBryde's treatment of the clerk of the court 
without considering whether the Judge had a reasonable 

basis for thinking the clerk's conduct verged on contempt. 
See id. at 72-78; cf. In re McBryde, 117 F.3d 208, 219 (5th 
Cir. 1997) ("Judge McBryde's understanding of the factual 
basis for suspecting that Clerk Doherty was on the verge of 
contempt was similarly within the bounds of reason."). How 
can conduct amount to a clear abuse of judicial power unless 
that conduct seemed abusive to an objectively reasonable 
judge? Put differently, it seems absurd to say that conduct is 
clearly abusive if a reasonable judge under the circumstances 
would have thought it appropriate.

 The Report's discussion of the manner in which Judge 
McBryde enforces his trial rules is similarly flawed. I agree 
that if a judge "imposes unduly stringent rules on advocates 
and enforces these rules in an often harsh manner," and if as 
a result those rules "so restrict cross-examination that they 
impede the effective administration of justice," that conduct 
should be sanctionable. Report at 116. Yet the Report's 
description of Judge McBryde's rules and their enforcement 
includes many phrases and characterizations that encompass 
perfectly legitimate trial practices: Judge McBryde's cases 
are "replete with [the Judge's] constant admonishments to 
counsel to move on to something else; not to allude to a 
stipulated fact; and orders to (or threats to order) lawyers to 
sit down during openings of the examination of witnesses," id. 
at 110; "Judge McBryde ultimately uses the threat of con-
tempt and sarcasm to enforce his rules," id. at 111; "[t]he 
Committee heard numerous additional examples of Judge 
McBryde's interrupting a lawyer during the questioning of a 
witness or conduct of the trial to enforce one or more of his 
rules, sometimes in a harsh, threatening, or sarcastic man-
ner," id. at 113. To be sure, the Report also states that the 
Committee was "fully cognizant of the notion that a trial 
judge should be afforded broad discretion to manage and 
conduct trials," and that Judge McBryde's "extreme and 
unduly restrictive rules" and manner of enforcement were 
"different not only in degree but also in kind from the wide 
array of acceptable trial management rules." Id. at 121-22. 
But simply stating this conclusion provides insufficient guid-
ance about why in Judge McBryde's case "admonishments to 

counsel to move on," "the threat of contempt and sarcasm," or 
other routine conduct amounted to a clear abuse of judicial 
power. Because this section of the Report contains too much 
general language that could describe any judge's appropriate 
courtroom conduct, resting sanctions on these descriptions 
could chill the legitimate exercise of judicial power.

 The Council failed in other ways to take sufficient account 
of the Report's chilling effect. In its discussions of Judge 
McBryde's accusations of attorney bad faith, for example, the 
Report never acknowledges that judges must often assess 
attorney good faith, or that it is not necessarily out of order 
for a judge to attempt to send a message to an entire office 
that has given him problems in the past. See Bonds v. 
District of Columbia, 93 F.3d 801, 805 n.7 (D.C. Cir. 1996) 
("If they [the District's counsel] don't show, you proceed 
without them. If the witnesses don't show, I'll hold them in 
contempt. That's the only way I can deal with the District of 
Columbia Government these days.") (quoting trial transcript). 
Nor does the Report sufficiently acknowledge that district 
judges need a reasonable margin of error in making findings 
of bad faith, especially when presiding over tense trials 
calling for quick decisions to control the behavior of aggres-
sive lawyers. Nor, finally, does the Report recognize that 
assessments of attorney bad faith are not necessarily abusive 
even if later set aside on appeal. See Report at 14-15 ("The 
Fifth Circuit ... noted that there was no evidence of bad 
faith on the [accused party's] part."). To avoid chilling 
appropriate judicial conduct, I think the Committee should 
have explained more thoroughly and more explicitly how 
Judge McBryde's behavior differed from permissible exercis-
es of judicial power.

 The Council's insensitivity to the potentially chilling effect 
of its Report is likewise apparent in its discussion of the 
impact Judge McBryde's behavior had on others. Describing 
the effect of Judge McBryde's enforcement of his trial rules 
upon the adversarial process, as well as the impact of the 
Judge's abusive treatment of attorneys upon the Fort Worth 
legal community as a whole, the Committee often seems to 
credit the views of witnesses who testified before it without 
ever determining whether those views represented what rea-

sonable lawyers would have felt in similar circumstances. 
The Report explains, for example, that the prosecutor Judge 
McBryde accused of using a "cat-and-mouse approach to 
discovery" left legal practice in part as a result of that 
incident, quoting at length the attorney's explanation of why 
the threat of Judge McBryde's treatment led him to leave his 
job. See Report at 51. Similarly, the Report cites the 
testimony of numerous lawyers who stated that they felt 
oppressed, harassed, afraid to ask questions, and generally 
unable to function effectively in Judge McBryde's courtroom. 
See id. at 116-21, 132-37.

 I agree that a judge whose harsh management of trials 
makes it impossible for lawyers to practice in front of him 
creates a serious problem. I also understand that proving 
that a judge had such an effect requires testimony from 
lawyers who practice before the judge. But in examining the 
testimony of such lawyers, the Committee should have at-
tempted to discern not simply whether Judge McBryde had a 
disruptive effect on the Fort Worth legal community, but also 
whether his conduct would clearly prejudice the ability of 
reasonably resilient and thick-skinned lawyers to present 
their cases effectively.

 In sum, I have no doubt that several of Judge McBryde's 
actions were clearly sanctionable: they were flagrant abuses 
of judicial power. In its understandable desire to be thor-
ough, however, the Committee included in its Report many 
actions and incidents which either seem to be entirely appro-
priate or involve conduct that might have been appropriate 
under some circumstances. I understand that even actions 
which are not obviously and flagrantly abusive on their face 
can be abusive either in context or as part of a pattern. 
Because of the fundamental importance of judicial indepen-
dence and the risk that sanctions could punish or chill legiti-
mate judicial behavior, however, I think that sanctioning such 
conduct requires judicial councils to explain precisely how and 
why it rises to the level of a clear abuse of judicial power. 
Here, the Committee's Report falls far short of this standard. 
I would therefore have remanded the case to the Council with 
instructions to limit its Report to evidence that, when viewed 

objectively, demonstrates a pattern of conduct that amounts 
to a clear abuse of judicial power, or a pattern of conduct 
clearly prejudicial to the adversarial process, and then in 
light of this sharpened record, to re-evaluate the appropriate-
ness of the sanctions and to impose those sanctions deemed 
necessary to deter future misconduct by Judge McBryde and 
other judges and to preserve the reputation and integrity of 
the federal judiciary.

 V

 Because my colleagues recognize that Judge McBryde's 
challenge to the reprimand is not moot, the substance of the 
foregoing analysis is largely unaffected by their view that his 
challenge to the suspensions is moot. But because under my 
colleagues' theory of mootness, a judge suspended for only a 
few years but not reprimanded would never be able to 
challenge the suspension, I respectfully register my disagree-
ment with this aspect of the court's opinion. In my view, 
Judge McBryde's challenge to his suspensions is not moot for 
two independent reasons. First, the suspensions--which re-
main published on the Fifth's Circuit's web site, see 
http://www.ca5.uscourts.gov/mcbryde/council.htm (last visited 
Sept. 6, 2001)--give rise to ongoing stigmatic and reputational 
injury at least as serious as that of the reprimand. Second, 
Judge McBryde raises an issue that seems "capable of repeti-
tion yet evading review." Weinstein v. Bradford, 423 U.S. 
147, 149 (1975). Although this court's opinion puts Judge 
McBryde on notice that his peers can constitutionally sanction 
him for some inappropriate in-court conduct, see Maj. Op. at 
25, the opinion leaves unclear precisely what kind of conduct 
would trigger sanctions. The court never decides whether it 
was constitutional for the Judicial Council to have sanctioned 
Judge McBryde for the conduct described in the Report, and 
I do not think informing Judge McBryde in the abstract that 
he must give his colleagues at least a "modicum of civility and 
respect," id., provides much guidance about what kind of 
conduct is constitutionally sanctionable. Thus, even assuming 
that Judge McBryde accepts the court's conclusion that his 
peers can punish him for some in-court conduct, he will not 
know whether it is constitutional for his peers to sanction him 

for behavior like that described in the Report. See Report at 
59 (stating that Judge McBryde believed his incarceration of 
a lawyer for refusal to answer a question was "appropriate 
under the circumstances"); id. 63-64 (quoting transcript of 
Committee hearing suggesting that Judge McBryde thought 
it was appropriate under the circumstances to have a state 
court judge removed from his chambers without asking the 
state judge why he had come to see Judge McBryde). Given 
this uncertainty, and given Judge McBryde's aggressive judi-
cial style, there is ample reason to suspect that his behavior 
might again provoke sanctions.